UNITED STATES *v.* R. HILLIER'S SON CO., INC. (No. 3053[1])

United States Court of Customs Appeals, May 7, 1928

*Charles D. Lawrence*, Assistant Attorney, General (*Fred J. Carter*, special attorney, of counsel), for the United States.
*John Giblon Duffy* for appellee.

[Oral argument April 10, 1928, by Mr. Carter and Mr. Duffy]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The imported material involved in this protest is commonly known as soapbark siftings and was imported from Germany. It consists of a fine powder, in which are mixed very small shreds of bark-like substance. It is produced from processing the bark of a Chilean tree known as quillai or quillajo. The evidence shows that large pieces or slabs of the bark are taken from Chile to Germany, there processed, and the processed material then imported into this and other countries. In producing the material in question here the bark is fed into a cutting machine, where it is cut into small chips. After cutting, the bark passes out of the cutting machine upon a sieve, which carries the chips into a bin or receptacle, and permits the powdered and fine material to drop through into another receptacle, thus separating the chips from the siftings. Both chips and siftings are used for the same purposes in this country, it being shown that before being used for their ultimate purposes they must be ground into a fine powder. This powder is used for various purposes, as a carrier for fly spray, in the making of soft drinks, and in

---

[1] T. D. 42762.

medicine, as a sort of an expectorant. The testimony shows that the quillai bark has been imported into this country directly from Chile, and here subjected to the cutting process, and it is not claimed that this bark can not be imported without injury or inconvenience in its original condition. It was classified by the collector as a crude drug, advanced in value or condition, under paragraph 34 of the Tariff Act of 1922. The protest claimed it to be free of duty as a drug not advanced in value or condition, under paragraph 1567, or, in the alternative, as a vegetable substance, crude or unmanufactured, under paragraph 1622 of said act. The court below sustained the protest, indicating, by its opinion, that the importer's protest might be sustained under either claim made by it. From the resulting judgment the Government has appealed, assigning as error here the failure of the court below to hold said goods dutiable under said paragraph 34, or, in the alternative, in not finding said goods to be dutiable as waste, under paragraph 1457, or as a nonenumerated manufactured article, under paragraph 1459. Said paragraphs 34 and 1567 are as follows:

PAR. 34. Drugs, such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided*, That the term "drug" wherever used in this act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes: *And provided further*, That no article containing alcohol shall be classified for duty under this paragraph.

PAR. 1567. Drugs such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, logs, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; all of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: *Provided*, That no article containing alcohol shall be admitted free of duty under this paragraph.

Counsel for the Government, in their brief filed here, base their principal argument upon the assumption that the article of importation is not a drug, that it is, in fact, a waste, and that, therefore, the court should reverse the judgment of the court below without approving the classification of the collector, on the authority of *Tower & Sons* v. *United States*, 11 Ct. Cust. Appls. 155, T. D. 38947, and *Balfour, Guthrie & Co.* v. *United States*, 14 Ct. Cust. Appls. 78, T. D. 41582.

In the view we take of this record, it will not be necessary to pass upon the question thus presented. The collector classified this material as a drug, advanced in condition. In order to so classify it, the presumption is that the substance conformed with the statutory definition found in said paragraph 34 and was chiefly used for medicinal purposes. *United States* v. *Chichester & Co.*, 14 Ct. Cust. Appls. 71, T. D. 41579; *Burstein & Sussman* v. *United States*, 14 Ct. Cust. Appls. 255, T. D. 41877; *United States* v. *Kaufman & Co.*, 14 Ct. Cust. Appls. 264, T. D. 41881.

In the court below the case was tried by both parties upon the theory that the imported material was a drug, the only issue being as to whether it was crude or advanced in value. Neither party made any attempt to produce evidence as to the chief use of the imported soapbark powder. We have made a careful search of the record and can find no evidence which in any way overcomes the presumption raised by the collector's classification that the imported material is chiefly used for medicinal purposes.

Richard V. S. Hillier, a witness for the importer, testified:

In its ultimate form it is used as a carrier for fly spray. * * *

The WITNESS. The question is, how do I understand that the drug has a drug value, a therapeutic value?

Q. Yes; how did you learn it?—A. By selling to the manufacturers of medicinal preparations, and being on the road for four years and talking with the chemists from the various houses to which we sell; naturally we know that the material goes into medicinal preparations. * * * It is used as sort of an expectorant. * * * Cut and sifted soapbark is used sometimes with soft drinks.

Sydnor B. Penick, a witness for the Government, testified:

Q. What are the uses of it?—A. * * * The uses of the product, which I believe is your question, pass on beyond us. We supply merely to the manufacturing trade and the distributing trade who require it. Generally speaking, its purposes are for washing or to be used in the processing of rubber tires and various technical uses.

Justice McCLELLAND. Is there any other use for it at all?

The WITNESS. None of any consequence.

This last witness, as we understand it, was speaking of the uses of this material by the trade with which he dealt, and not otherwise.

This testimony is not sufficient to overcome the presumption of correctness attached to the collector's finding. In fact, the importer, upon whom was the burden of proof, did not attempt to do so, and counsel for the Government, upon the trial below, expressly disavowed such an intention. In view of the state of the record we must conclude that the imported material must be treated as a drug. The only open question is as to its character, whether it be crude or advanced.

This court, and other courts having to pass upon customs matters, have had frequent occasions to judicially determine the meaning of the word "crude." The meaning attached to the term will be found to vary somewhat according to the language of the particular statute that is being construed. A few examples will illustrate this.

In T. D. 23698, 5 Treas. Dec. 359, General Appraiser Somerville, passing upon certain so-called zinc dust, under paragraphs 386 and 482, respectively, of the Tariff Acts of 1894 and 1897, which provided for articles in a crude state, used in dyeing and tanning, held that such zinc dust was free of duty under said paragraphs. This court, in *Merck & Co.* v. *United States*, 5 Ct. Cust. Appls. 347, T. D. 34549, held that opium, in bricks and cakes, although subjected to processing, was crude, under paragraph 41 of the Tariff Act of 1909, providing for opium, crude or unmanufactured.

In *United States* v. *American Chicle Co.*, 10 Ct. Cust. Appls. 98, T. D. 38360, this court held that chicle imported into Canada from Mexico, and there crushed into smaller particles, sacked, and then imported into the United States, was crude chicle under the provisions of paragraph 36 of the Tariff Act of 1913, providing for chicle, crude, rather than as chicle, refined or advanced in value by drying, straining, or any other process or treatment whatever beyond that essential to its proper packing.

Other similar cases are *United States* v. *Danker & Marsten*, 2 Ct. Cust. Appls. 522, T. D. 32251 and *United States* v. *Rice Co.*, 9 Ct. Cust. Appls. 165, T. D. 37998. In *Togasaki & Co.* v. *United States*, 12 Ct. Cust. Appls. 463, T. D. 40667, we thus defined the word "crude":

It has been held to mean, when applied to the name of anything, that this thing, however much it may be processed, if, as a matter of fact, it must go through some additional process of substantial preparation or manufacture in order to fit it for its chief or only use, is, so far as that use is concerned, a crude article.

These cases, it will be observed, are decided largely upon contests between provisions of statutes where the same article is classified on the one hand as "crude" and on the other hand as "manufactured." If that were the issue in the case before us, there might be no difficulty in deciding that the article of importation here was crude, because it is shown, by the record, that it is not ready for its ultimate use, but must be reground. But we have a different question here, due to the differing provisions of the statutes involved. It will be useful, in this connection, to call attention to the various legislative provisions relative to crude drugs, prior to the Tariff Act of 1922. Paragraph 20 of the Tariff Act of July 24, 1897, provided for drugs "in a crude state, and not advanced in value or condition by refining or grinding, or by other process, and not specially provided for."

Under that statute, General Appraiser Somerville held, in T. D. 23473–B, 5 Treas. Dec. 45, that material apparently identical with the material imported here was a drug in a crude state, and not advanced in value, as specified in the statute.

In *Perry, Ryer & Co.* v. *United States*, 2 Ct. Cust. Appls. 374, T. D. 32096, this court had under consideration certain cut and shredded fustic dyewood which was imported under the acts of July 24, 1897, and August 4, 1909. It was shown, in the case cited, that it was necessary to cut the wood into small pieces in order to pack the same for importation.

Paragraph 20 of said Act of 1897 and paragraph 20 of the Act of August 5, 1909, together with paragraph 27 of the Tariff Act of October 3, 1913, for purposes of comparison, are here quoted:

PAR. 20. Drugs, such as barks, beans, berries, balsams, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, gums and gum resin, herbs, leaves, lichens, mosses, nuts, nutgalls, roots, stems, spices, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and woods used expressly for dyeing; any of the foregoing which are drugs and not edible, but which are advanced in value or condition by refining, grinding, or other process, and not specially provided for in this act, one-fourth of one cent per pound, and in addition thereto ten per centum ad valorem.

PAR. 20. Drugs, such as barks, beans, berries, balsams, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, gums and gum resin, herbs, leaves, lichens, mosses, nuts, nutgalls, roots, stems, spices, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and woods used expressly for dyeing or tanning; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for in this section, but which are advanced in value or condition by any process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, one-fourth of one cent per pound, and in addition thereto ten per centum ad valorem: *Provided*, That no article containing alcohol, or in the preparation of which alcohol is used, shall be classified for duty under this paragraph.

PAR. 27. Drugs, such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, gums, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, and weeds; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for in this section, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided*, That no article containing alcohol shall be classified for duty under this paragraph.

In *Perry, Ryer & Co.* v. *United States*, *supra*, Judge Martin, speaking for the court, said:

The process above mentioned, whereby the roots and branches of the fustic are cut and shredded into pieces as small even as those contained in the importers' exhibit, must certainly constitute an advance in the value and condition of the wood. The wood of the roots and branches is to be used expressly for dyeing; so soon as it is severed from the ground it comes to this first estate as wood used

expressly for dyeing. It has a certain value and is in a certain condition when it is thus severed from the ground. That condition is substantially changed and that value materially increased when the wood is afterwards ground or cut into small fragments, for in the new condition it may be transported at less expense and it is also in a form better adapted to its final use. The statutory provision of the Act of 1897 relating to an advance in value or condition from refining, grinding, or other process is unqualified; any advance whatever in value or in condition, which results from refining or grinding, or other process, brings the wood within the dutiable class defined by paragraph 20 of that act.

It therefore seems clear that the importations entering under the act of 1897 were not free of duty as dyewood which was "not advanced in value or condition by refining or grinding, or by other process."

\*     \*     \*     \*     \*     \*     \*

However, as to those importations which were entered under the Tariff Act of 1909 a much more serious question presents itself. Under the applicable paragraphs of that act the corresponding provisions relating to advancement in value or condition are not so comprehensive and unqualified as are those of the former acts. Quite to the contrary, an advancement of such dyewood in value or condition by any process or treatment does not alone deny the article free entry if such advancement is essential to the proper packing of the wood or the prevention of decay or deterioration pending manufacture. The provision relating to proper packing of course covers and includes packing for transportation. A new element is thus introduced into the paragraph which was not before the board in the case above cited, relating to like importations under the Act of 1894. Under the prior acts such an importation was denied free entry if it had been advanced at all in value or condition by refining, grinding, or other process. Under the Act of 1909, however, such an importation is given free entry, notwithstanding such an advance in value or condition by any process or treatment, provided only the advance so made be essential to its proper packing, or, as applied to this case, its proper packing for transportation.

In conclusion, it was held, in that case, that the dyewood was dutiable under the Act of 1897 and not dutiable under the Act of 1909

It will be observed from paragraph 27 of the Act of 1913, above quoted, that a material change was made by the Congress in drafting that paragraph, evidently to meet the suggestions made by this court in *Perry, Ryer & Co.* v. *United States, supra,* by the addition of the language "by shredding, grinding, chipping, crushing." This language was carried forward into the Tariff Act of 1922. Under the Tariff Act of 1922 we had under consideration, in *Vandegrift & Co.* v. *United States,* 13 Ct. Cust. Appls. 30, T. D. 40865, certain ground glands of cattle, imported for medicinal purposes. The evidence disclosed that it was necessary to so grind these glands in order to prevent decay or deterioration during transportation and pending manufacture. While the court held, on that record, that the glands were not advanced within the meaning of paragraph 34 of said act, the court, speaking through Bland, J., said:

It may be a fact that the gland as a whole can be dried and satisfactorily transported to this country in its whole, dried condition. If the record so showed we would be inclined to hold that the grinding would be an advancement, taking it out of paragraph 1567, but in this record the contrary appears.

The record now before us, as has been stated, discloses that the material in question here can be, and is, imported as bark, and that the form in which we now find it is not necessary for the prevention of decay or deterioration pending manufacture. This being the test imposed by the statute, it can not·be held to be crude. The bark itself is shipped from Chile to Germany, there processed, and then brought back, which, in itself, demonstrates the feasibility and practicability of the importation of the crude bark. In our opinion, the language "shredding, grinding, chipping, crushing," which was inserted by the Congress in the Tariff Act of 1913, was intended to cover such cases as this, where the cutting and shredding processes were not necessary for the proper shipment of the material. Therefore, the Congress intended to limit the meaning of the word "crude" by the express limitation which it placed in the paragraph, and evidently did not intend the same meaning to be applied to the word "crude" as it appears in paragraph 1567, as might be applicable if the word "crude" were used by itself and without words of limitation and explanation.

The judgment of the court below is, therefore, *reversed*.