UNITED STATES *v.* FOOCHOW IMPORTING Co. (No. 3335)[1]

United States Court of Customs and Patent Appeals, January 21, 1931

*Charles D. Lawrence*, Assistant Attorney General (*Hugo P. Geisler*, special attorney, of counsel), for the United States.
*Lawrence A. Harper* for appellee.

[Oral argument October 10, 1930, by Mr. Lawrence]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Appellee imported a shipment of articles from Japan. They appear to be known there and in China as "mokugyos." In the United States they are sold as "temple blocks." The goods were entered at the port of San Francisco.

---

[1] T. D. 44562.

The collector classified and assessed them for duty as musical instruments under that portion of paragraph 1443 of the Tariff Act of 1922 which reads:

PAR. 1443. Musical instruments and parts thereof, not specially provided for, * * * 40 per centum ad valorem, * * *.

Appellee protested this classification, claiming the merchandise to be dutiable at 33⅓ per centum under paragraph 410, or as "wood not further advanced than cut into blocks * * *" at 10 per centum under paragraph 402, and also further claiming in the alternative under paragraph 1459, the "catchall" or "basket" clause of the law. The Customs Court sustained the protest and held them dutiable at 33⅓ per centum under paragraph 410, the pertinent portion of which reads:

PAR. 410. * * * Manufactures of wood * * * or of which wood * * * is the component material of chief value, not specially provided for, 33⅓ per centum ad valorem.

The Government appealed from the judgment, and so brings the matter before us. Appellee made no oral argument but submitted on brief.

We regard the issue as being between paragraphs 1443 and 410, above quoted, and will not further consider appellee's alternative claims. They do not appear to be seriously pressed.

As a part of the record in the case there was filed collective Exhibit 1, consisting of five samples of the merchandise. These comprise what, we understand from the testimony, is known as a "set." Each individual article appears to be carved or cut from a single piece of hardwood and is, as stated by the Customs Court, shaped somewhat like a sleigh bell. Each is hollowed and divided at the bottom and up the two sides or ends, the "split" or "crack" widening toward its upper terminations. Each has a handle painted black. The body is painted red and there are gilded carvings upon it. They are curvilinear in formation and of varying sizes, the largest being, at the widest point, about 7 inches in diameter one way and 6 inches the other, while the smallest is about 4 by 3. When used as a set they are said to be usually suspended on a horizontal bar (illustrated by a pencil drawing filed as Exhibit 2) at the apex of a tripod, and the Government brief alleges that when so suspended and "struck by a wooden hammer, they emit a sound to produce certain kinds of musical tones and effects."

There was filed as Exhibit 3 what is designated as section 4 of a "Musical Instrument Catalogue—Drums and Drummers' Goods." On page 65 of this catalogue under the heading "Temple Blocks," we find the following:

No. 1003—4-inch _____ $3. 00
No. 1004—4¾-inch _____ 3. 50
No. 1005—5¼-inch _____ 4. 00
No. 1006—6-inch _____ 4. 50
No. 1007—6½-inch _____ 5. 00
No.     16—Set of 5, tuned with stand and holders _____ 20. 00

On page 64 there is a picture of a table or shelf, held by rods above, a drum to which the rods are attached, having what appears to be a set of five temple blocks arranged in order of size, and some other attachments. Immediately below the picture appear the words "Leedy Trap Table," and lower in the column under the head "Leedy Trap Holders to Fit the Above Table" appears the line:

No. 245—Temple block holders, $0.75

It was established by a Chinese merchant, named Loo Lum, called as a witness by appellee, that the articles in question are used in Chinese worship to wake up the idol and that only one was used at a time in the temple where he visited; that "Chinese never buy these for music"; that he does not buy or sell them as Chinese musical instruments and knows of no one who does; that they are sold as "temple blocks"; that one of his customers was a musical house, Sherman, Clay & Co., and that he sold to a manufacturing company in Indianapolis, Ind.; that he had never been where white orchestras used them; that they were not used in Chinese orchestras; that he sells them to almost anybody who comes into his store to buy them; that he sells them, "sometimes 5; some people get 1, some 2, different sizes"; that they are used also for ornaments in houses and in windows.

On cross-examination he stated that he had seen them in three American houses "where they live" and "some put in store's window," and that during the time he had been selling them he had seen "one or two in temple houses where the idols are." He also said that they were, in sets of five, hung on a steel or other kind of bar and hit with a wooden mallet, and that some people use them for dinner calls; that he preferred to sell, and did sell, the articles in a "regular way," in sets of five, but would sell a single article at an advanced price; that his sales to Sherman, Clay & Co. were at wholesale as temple blocks, "a couple of sets at a time," and that he had been selling to that company about two or three years.

Another witness called on behalf of appellee was Charles F. Mitchell, who testified that he had played musical instruments such as "drums and traps, saxophone, xylophone, and piano," having joined the Musicians' Union in 1910 and having played professionally with numerous bands, naming five. His last playing seems to have been in January, 1923. The witness stated that during the time he was playing he came in contact with articles like collective Exhibit 1 and

for that "we call them part of our traps"; that is, orchestra "traps" for a trap drummer.

The witness does not appear to have used articles like the ones involved, but states that since 1923 he has observed them in use "many times" by orchestras "at theaters and places where orchestras were playing"; that they "are used in connection with presenting the full orchestral piece they are playing * * * where necessary to fill out the composition * * * just the same as a drum or as cymbals"; that they are used for "effects. * * * Noises, effects, the same as a crash in part of a musical composition."

Q. What effects do you mean?—A. The effect that you would use those for in an orchestra would be as the old wood block that we had to imitate a horse in coming up the street in the distance, and gradually going away again. Also you would use them to fill in certain, what we call in the orchestra, fake notes. * * * That is all the uses you have for them in the composition that is arranged during the piece. If the piece called for them in the composition, you fill in that particular note as it is called for on your music sheet.

And on cross-examination he said:

They are used for the effect, to carry out the certain ideas the composer had, to make that assembled piece. When he composes the orchestration of this musical composition that he has, he puts in certain notes for the drummers to bring out to get his idea. For instance, if it was an Indian play, a play that would want to have the audience believe it was an Indian composition, he would have similar items as this to carry out that; as we call it the musical effect.

Q. So that one hearing that can visualize what was in the mind of the composer?—A. Yes.

Q. And, therefore, in an orchestral composition where these are used, it is necessary to use them to carry out the effect of the composer?—A. Yes.

The witness was asked several questions relative to musical notes, tones, and octaves. His answers are not very clear—at least not to the understanding of the court. He does say, however, speaking of collective Exhibit 1:

The exhibit before me here could not make an octave for the simple reason there is only five pieces, and in a full octave there is at least seven necessary to make a full octave.

He further said:

A single block could not produce an octave, only a single note.

The Government called one witness, Frederick B. Norton.

Mr. Norton is connected with the Coast Wholesale Music Co. of San Francisco, which is the successor of Sherman, Clay & Co. The Coast company and its predecessor have been engaged in the musical-instrument business for more than 60 years. It now selsl only at wholesale but its predecessor did both a wholesale and retail business. It is a large concern and sells "all over the country." Both the Coast company and Sherman, Clay & Co. issued catalogues

of their wares, and Exhibit 3, above referred to, is one of those issued by the latter.

Mr. Norton testified that his company regularly imports these temple blocks in sets of five; that occasionally when they have "run short" they have bought from the witness, Loo Lum; that they buy them under the name mokugyos and sell them as temple blocks for use "as a part of the drummer's outfit," that they are, as a rule, mounted on a horizontal bar at the apex of a tripod, and are "struck by the drummer with his drumstick or a padded stick made for that purpose"; that he has seen them "very frequently" used in orchestras.

Upon cross-examination the witness said: "Musical instrument, I presume, can be defined as anything that produces music"; that his company dealt in "band, orchestra, and stringed instruments, or what are known in the music trade as small musical instruments, or small goods, and their accessories"; that he would not term musical accessories as musical instruments. Referring to the temple blocks as listed in the catalogue, Exhibit 3, under the heading "Drum Traps and Accessories," his testimony was:

Q. Now are those, in drawing your distinction between musical instruments and musical accessories—also noting the heading at the top of this catalogue— would you call those accessories as contradistinguished from musical instruments?—A. Well, I believe they would be more accurately termed musical accessories. Yes; it would be rather a stretch of the imagination to call them musical instruments.

The witness, in response to inquiries, pointed out that the catalogue also listed under the heading of drum traps, and accessories such articles as "slapsticks, cow bawl or moo, and baby cry," which, he stated, are used in orchestras not to make music, but "I think, strictly speaking, those would have to be termed as effects; imitations of the actual sounds." He further testified that he could "hardly think that cymbals can be designated musical instruments," but that they have been used from time immemorial in connection with drums and are used by standard classical composers, but that the temple blocks are not so used. He states that in oriental musical numbers the blocks furnish "the oriental atmosphere," and adds "but these blocks are also used in compositions not oriental in nature."

The court below in its opinion said in part:

* * * We have not any doubt that the temple blocks before us are not musical instruments. They are often sold separately, and the noise produced by any one of these blocks is not a musical note. The five together do not produce music, nor in any way emit musical strains. Not one of these blocks alone, nor all together, can carry a theme, and music without a theme is useless. The use to which they are employed by the Chinese to invoke their gods by hammering thereon with a mallet or stick, and the reverberations of such sounds throughout a pagoda, temple, or hall, have not the faintest resemblance to musical uses or musical notes. If music soothes the savage breast, the noises

emitted from these blocks would so grate upon the savage nature as to incite him to battle and to greater fury rather than ameliorate his feelings.

One of these blocks by itself can not produce music. It may, by producing an afterbeat in an orchestra, fill in some gap, but in musical tones it is wholly lacking.

    \*      \*      \*      \*      \*      \*      \*

Granting that rude instruments may produce a semblance of music, it does not in any way establish that these temple blocks possess musical qualities. When Congress was legislating as to musical instruments, it had in mind instruments which emit notes of sympathy and harmony pleasing not only to the cultivated musician but to the ordinary ear.

Before us, Government counsel argues that the view of the Customs Court as to the term "musical instruments" is too narrow. In the Government's brief it is said:

Under the principle of the decision of the court below, trumpets and horns, cymbals, tambourines, drums, tom-toms, kettledrums, triangles, and castanets would not be held to be musical instruments, because of their tone quality and limited tone production.

It is common knowledge that all of the above-named instruments are known to be musical instruments, and are so held by this court, and that they are extensively used in orchestras for the production of musical effects in classical music as well as in jazz.

In *United States* v. *Bernard Judae & Co. et al.*, 13 Ct. Cust. Appls. 306, T. D. 41230, the issue presented was whether certain somewhat diminutive instruments therein described, found to be capable of having musical notes produced upon or by them, should be classified as musical instruments or as toys. In the course of the court's opinion, after reviewing and discussing the conflict in decided cases as to what constitutes a musical instrument, the following was said:

It will thus be seen there is but little uniformity of judicial decisions on this subject. On the whole, we believe the most clear and concise definition of a musical instrument found in any of the cases is that given by General Appraiser Fischer in T. D. 22765, *supra*, where it is said:

If an article is capable of being played upon as a musical instrument by a person who has learned to play such an instrument, whether that person be a child or an adult, it can not be said to be chiefly designed and suitable for use as a plaything for children, and is not a toy. If it is so capable of being played upon as a musical instrument, it is immaterial what may be its size, the quality of its tone, its price, or the cheapness of its construction.

It will be observed that the definition of a musical instrument there states that it is an article "capable of being played upon as a *musical instrument* by a person who has learned to play such an instrument \* \* \*." (Italics ours.) For the purpose of determining whether a sound-producing device was a musical instrument or a toy, the definition laid down by the Board of General Appraisers and quoted with approval by this court would seem to meet the requirements. It will be observed that a musical instrument is defined as an article capable of being played upon as a *musical instrument*.

In the *Bernard Judae & Co.* case, *supra*, there was no question about the notes being musical notes or that a tune could be played upon the instrument in the usual way for that class of instruments, the question being: Was it a toy musical instrument or was it a musical instrument within the meaning of the dutiable musical-instrument paragraph? The issue at bar, if we were to apply the rule in the *Bernard Judae & Co.* case, *supra*, requires a consideration not of the toy characteristics of the article but as to whether or not the article is played upon "as a musical instrument." In view of the issues present in the case at bar and not present in the *Bernard Judae & Co.* case, *supra*, we think the definition of a musical instrument, therein contained, must be broadened.

The New International Encyclopaedia thus defines musical instruments:

Musical instruments are generally divided into four large groups, according to the manner in which the sound is produced, viz: (1) Stringed instruments, (2) wind instruments, (3) instruments of percussion, (4) keyed instruments. * * *

The instruments of percussion may be divided into two principal classes: (a) Those which have definite pitch; (b) those which have not. The former class comprises (1) the kettledrums, (2) the glockenspiel, (3) the xylophone. The latter class includes (1) the bass drum, (2) the small drums, (3) the tambourine, (4) the tamtam, (5) the cymbals, (6) the triangle, (7) the castanets.

The Government's claim as to the merchandise involved is that the temple blocks are musical instruments of percussion, on all fours, as we understand it, with triangles, drums, and cymbals.

We think, for tariff purposes, and as applied to the facts and issues in this case, a musical instrument may be said to be any sound-producing contrivance which, in this country, is chiefly used in making music, or in connection with making music to give volume, tone, or effect to the same. We are not here concerned with just what constitutes "making music," when considered with the toy or other tariff provision not here involved.

It has been argued here that if the articles before us are to be held musical instruments, then a handsaw, a hat, dish pan, jug, or broom handle, or the like, ofttimes used in connection with jazz music, must also be regarded as musical instruments. Under the foregoing definition, it is at once apparent that none of these articles could be regarded as musical instruments unless chiefly used as such in this country. It is a matter of common knowledge that their use in connection with music making is only incidental to very extensive uses in other fields.

To hold that a musical instrument must be one upon which musical notes are made and which may be modulated or tuned so as to produce musical harmony, or one upon which a tune may be played, is in effect to hold that cymbals, drums, and triangles are not musical

instruments, although they have been uniformly held to be such. *United States* v. *Lyon & Healy*, 4 Ct. Cust. Appls. 84, T. D. 33366; *United States* v. *Sears, Roebuck & Co.*, 7 Ct. Cust. Appls. 60, T. D. 36388; *United States* v. *Sears, Roebuck & Co.*, 9 Ct. Cust. Appls. 33, T. D. 37875. Furthermore, the ordinary definition of a musical instrument includes instruments upon which sound is produced by percussion only. See International Encyclopaedia, *supra.*

Now, let us apply the foregoing observations to the case at bar. The collector classified and assessed the temple blocks at bar as musical instruments, which assessment carried with it the presumption that the collector found that the importation possessed the characteristics necessary and essential to bring it within the paragraph. *United States* v. *Stone & Co.*, 13 Ct. Cust. Appls. 233, T. D. 41180; *United States* v. *R. Hillier's Son Co. (Inc.)*, 16 Ct. Cust. Appls. 103, T. D. 42762, and cases therein cited.

It seems to us that the real issue in this case is: Does the evidence as a whole overcome the presumption of the collector's finding that the temple blocks are chiefly used in this country in making music, or in connection with making music to give volume, tone, or effect to the same? Instead of proving that they are not so used, the evidence as a whole is to the contrary. We conclude that the importer has failed to overcome the presumption inherent in the collector's classification and that the protest against the classification of the collector should have been overruled.

The judgment of the United States Customs Court is *reversed.*

### DISSENTING OPINION

GRAHAM, P. J., and GARRETT, J., dissenting:

We find ourselves unable to concur with the majority in this case. We are well aware, as was said in *United States* v. *Bernard Judae & Co.*, 13 Ct. Cust. Appls. 306, T. D. 41230, that the question of what constitutes a musical instrument is largely a matter of the taste and degree of education of the individual making the selection. However, there are certain instruments, which, by common understanding, in this day of the world, are known as musical instruments. Such are the violin, the piano, the harp, and many others which will readily occur to the mind. Included within the list are the well-known percussion instruments, such as the drum, the cymbals, and the triangle. Such instruments, capable of producing but a single tone, have, from time immemorial, been used in war and in peace to produce certain desired musical effects. Great composers have written parts for them in musical scores. If it were a matter of first impression as to some of these instruments, it might be doubted whether they should be classed as musical instruments. Centuries of use, however, have won them recognition as such.

But because such things have been generally acknowledged to be musical instruments is no reason for advancing the theory that everything used in connection with the rendition of music is itself a musical instrument. The definition given by the majority is, in our opinion, too broad. It is: "A musical instrument may be said to be *any sound-producing contrivance* which, in this country, is *chiefly used* in making music, or *in connection with making music to give volume*, tone, *or effect to the same.*" (The italics are ours.) Thus, we have a definition which includes rooster crows, cat and cuckoo calls, sheets of metal used for making sounds of thunder, mutes and tin hats for muting wind instruments, wooden blocks to represent the sound of the hoofs of horses, and a hundred other similar devices and *contrivances* which the ephemeral taste of the day encourages in that concatenation of jungle sounds known as "jazz." We refer now not to things which have other uses, but to such musical accessories as are made and used only for that purpose. These are not musical instruments, but are accessories merely. They are usually operated by the trap drummer or by a trap operator. There ought to be a proper distinction made between a musical instrument and a mere temporary and incidental accessory.

We are of opinion the judgment of the United States Customs Court is right and should be *affirmed.*

*Charles D. Lawrence*, Assistant Attorney General (*Hugo P. Geisler*, special attorney, of counsel), for the United States.
*Brown & Carter* (*Allan R. Brown* and *Fred J. Carter* of counsel) for appellee.

