(C. D. 478)

KNICKERBOCKER MILLS CO. *v.* UNITED STATES

United States Customs Court, Third Division.

(Decided April 28, 1941)

Barnes, Richardson & Colburn (J. Bradley Colburn of counsel) for the plaintiff.
Charles D. Lawrence, Acting Assistant Attorney General (Daniel G. McGrath, special attorney), for the defendant.

Before CLINE, EVANS, and KEEFE, Judges

EVANS, Judge: This is an action wherein the plaintiff seeks to recover certain sums of money claimed to have been illegally exacted on an importation of merchandise classed as dried berries at 2½ cents per pound under paragraph 736 of the Tariff Act of 1930 by the collector of customs at the port of New York. The protest claims that the merchandise is entitled to free entry as a crude drug under paragraph 1669, or as a crude vegetable substance under paragraph 1722, and by amendment it is claimed to be dutiable as a vegetable substance used for coloring under paragraph 1670 of the said act. Plaintiff's brief states that it relies upon the latter claim. In the absence of proof we overrule the claims asserted under paragraphs 1669 and 1722, without giving further consideration to them.

The paragraphs of the tariff act involved read as follows:.

PAR. 736. Berries, edible, in their natural condition or in brine, 1¼ cents per pound; dried, desiccated, or evaporated, 2½ cents per pound; * * .*

PAR. 1670. * * *. all articles of vegetable origin used for dyeing, coloring, staining, or tanning, all the foregoing, whether crude or advanced in value or condition by shredding, grinding, chipping, crushing, or any similar process; all the foregoing not containing alcohol and not specially provided for.

At the hearing a witness identified and there was received in evidence a sample of the merchandise. Two witnesses testified for the plaintiff. The testimony may be summarized as follows: Dr. Karl H. Landes stated that he was chief chemist and manager of the crude drug department of the Knickerbocker Mills, plaintiff herein, that it is part of his duty to examine and analyze all merchandise imported by said concern. According to his testimony he is a doctor of pharmaceutical chemistry (University of Leipzig), and has been for more than 10 years, and is now engaged in the importation and sale of dried berries in the United States. He stated that he was engaged in the dried berry business in Hungary prior to his having migrated to the United States. The plaintiff concern imports dried huckleberries from Poland, Russia, and Czechoslovakia. The witness testified that he had visited these countries and investigated the growing, picking, and preparation of dried huckleberries for shipment to the United States, and stated, "'After the huckleberries have been picked they are put on a large tray which is punctured, in other words a per-

forated try, so the air should go through. They put it out in the sun and dry by the sun. After the exporter feels that the berries are dry enough, the huckleberries are dry, they put it in bags." He said that the imported huckleberries do not contain alcohol but there is some extraneous matter, such as stems, dirt, stones, etc., in the packages as imported. He stated that he had sold dried huckleberries as imported by the plaintiff to Fries Bros. and the Salient Chemical Co., both of New York City, that he had counseled with these concerns as to the use which they sought to make and did make of the berries, and that he had seen them used in their respective plants; that such berries had been used solely for the extraction of color therefrom, which extraction is used as coloring matter. He asserted that the plaintiff had sold dried huckleberries to the Mohawk Liquor Co., Hiram Walker & Sons, and Schenley Distillers, Ltd., all of which concerns used the berries for coloring purposes. The witness further testified that he had made tests of the berries and in so doing he first washed them thoroughly, then examined them under a microscope, and then put them in a tray to determine the acid insoluble ash; that on an average he found the imported huckleberries to contain a content of from 5 to 6 per centum acid insoluble ash.

Dr. Joseph Merory, the second witness, testified that he was associated with Fries Bros. of New York City, and was in charge of the production of fruit extracts for that concern, in which work he has been engaged for the past 2 years. He testified that he had degrees in chemical engineering from universities in Vienna. He swore that his firm had bought dried huckleberries like exhibit 1 from the plaintiff herein and that they had been used for coloring purposes. He also said that prior to his engagement with his present employer he had worked with Schenley Distillers for a year as chemist in charge of the production of cordials, and while there he used dried huckleberries for coloring purposes. He stated that he had introduced the production of concentrated fruit extract with H. Barrett of Brooklyn, where he also used dried huckleberries for coloring purposes, and that in the course of his experience he had seen them so used at other places.

The defendant's witness, Mr. Joseph Raphael, testified that he was employed by the Greenwich Preserve Co. of Brooklyn, which concern is engaged in the manufacture of jams, jellies, and pie filling; that he had been working there for 12 years, and that for 10 out of the 12 years he has been sales manager. During the time so employed he sold the products of his company, including merchandise like exhibit 1, imported from Russia and Poland, and that his concern used such dried berries in making huckleberry pie filling. He described the method of preparation of such filling as follows:

The dried huckleberries are brought into the house, and put into a 100 gallon kettle, a kettle containing about one-quarter huckleberries and three-quarters

water. They stand overnight. During the night, the leaves and stems come to the top, and the huckleberries become water-logged, and remain at the bottom of the kettle, as a rule. We skim the leaves and stems off, and allow the berries to soak for an additional 24 hours, and the result was that our yield was about 4 to 1, when the berries become water soaked. Then we used them just as we would use frozen or canned, blending them with sugar, water, tapioca, flour, pectin, and cooked them to approximately 212 degrees, and the result was huckleberry pie filling.

He stated that he had personally sold such filler. Four or five other salesmen are employed by his concern. They sell to big supply houses and to wholesale manufacturing pie bakers. He said that he had actually observed the purchasers using the huckleberry pie filler making pies and huckleberry cakes during the period 1928 to 1939 and that he had eaten pastries and pies which were made with dried huckleberry pie filler, such as he had described. He said his concern purchased the dried huckleberries from importers in the city and that such berries came from Russia and Poland. He stated that the leaves and stems float to the top of the water and are thrown away, that the berries are soaked in water for 3, 4, or 5 hours, sometimes 10 hours, and that the huckleberries as used in the pie filler are not used for the purpose of imparting color, but as a substitute for canned or cold-packed huckleberries.

It is claimed by the importer that the weight of the testimony supports plaintiff's theory that the merchandise is dutiable under paragraph 1670 because, as asserted, the evidence shows that the merchandise is chiefly used for the purpose of extracting color. It is true that the two witnesses called by plaintiff testified to the use made under their observation and by them, and their testimony was to the effect that such was the only use they had seen made of such merchandise. Their experience in this country extended to several plants, the location of all of which plants was not given, while the defendant's testimony related to the use of dried huckleberries by a single manufacturing concern which used them as a food product.

We approach the decision in this case under the legal presumption that the collector has found all the necessary facts to enable him to classify the goods as he did. *United States* v. *R. Hillier's Son Co., Inc.*, 16 Ct. Cust. Appls. 103, T. D. 42762; *United States* v. *Sandoz Chemical Works*, id. 392, T. D. 43119; *United States* v. *Fenton Co.*, id. 418, T. D. 43134; *Wo & Co.* v. *United States*, 15 Ct. Cust. Appls. 337, T. D. 42494. Plaintiff produced testimony by which he attempted to overcome the legal presumption just stated, whereupon the defendant took up the burden of proof and produced competent testimony to support the theory that the berries are used for the common purpose to which berries generally are put, i. e., as a food. Under such circumstances, where is the weight of the evidence?

The testimony establishes that the product is a dried huckleberry. The court can take judicial knowledge of the fact that the huckleberry constitutes a well-known article of food used in American homes. Since the importer seeks to take this product out of the classified rating given it by the customs officials, the burden is upon him to show that the use he claims is the chief use in the United States. The brief frankly admits and asserts that the plaintiff has so established chief use and he relies upon the proposition that the description of the merchandise which Congress intended to cover by paragraph 1670 is more specific than an *eo nomine* provision, since the intent of Congress was expressed in paragraph 1670 by the use of the words "all articles of vegetable origin used for dyeing, coloring, staining, or tanning * * *."

Plaintiff's brief calls attention to the case of *Roger & Gallet et al.* v. *United States*, 7 Ct. Cust. Appls. 89, T. D. 36424, wherein it was held, according to the headnote, that classification by use will prevail over an *eo nomine* designation if it appears that Congress so intended. This decision, after calling attention to the rule to the effect that an *eo nomine* designation generally will prevail over words of general description, states:

* * * This rule, however, is one of interpretation only, and is based upon the principle that when an article is described by name Congress intends to cover such commodities as are within the meaning of the words employed as the same are generally, definitely, and uniformly understood in the trade and commerce of the country. This, however, is but a rule of construction devised and applied for the purpose of ascertaining the legislative intent, and while of great importance can not be said to be controlling if it appears that Congress intended the classification to be determined by the *use* to which an article is devoted rather than by the *eo nomine* description itself.

After citing the case of *Magone* v. *Heller*, 150 U. S. 70, said decision states:

* * * While the question of classification under the *eo nomine* designation when confronted with a competing paragraph providing for exclusive use was not discussed, yet the court could not have reached the conclusion it did had not this question been in mind. The rule was established in the case that where use was the test, as in the term "expressly used for manure," it required classification thereunder of "those substances the only common use of which, either by themselves or in combination with other materials, is for the purpose of fertilizing the soil." It was held that the question of common use was one of fact to be determined according to applicable rules in such cases, and it was said that exclusive use for the designated purpose was not necessary, but that "if the only common use of a substance is to be made into manure, or to be itself spread upon the land as manure, the fact that occasionally, or by way of experiment, it is used for a different purpose will not take it out of the exemption."

The philosophy of the rule relied upon, as we gather it, is that the exception or the out of the ordinary use of a product will not give *that* use, i. e. the exceptional use, classification to the product. It will

still be controlled by the common or the ordinary use made of such product. If we apply that theory to the testimony in this case, backed by the common knowledge of experience as to the general use of berries of this type, before drying, plus the common knowledge of which the court may take judicial notice that many dried fruits are commonly used as food, plus the collector's action herein, it seems to us that the importer has not established that dried huckleberries, such as were imported, are chiefly used in this country in the manufacture of coloring matter.

Moreover, we have the presence of the "not specially provided for" clause in paragraph 1670 to consider in determining the issue here presented. Congress there provided for all the articles named with the limiting phrases "not containing alcohol" and "not specially provided for." The huckleberries in suit do not contain alcohol, but they are specially provided for in the act as "berries, edible, * * * dried," and are, therefore, excluded from the operation of said paragraph 1670.

Upon the record we overrule plaintiff's claims and sustain the finding of the collector that the merchandise is properly assessable as dried berries at 2½ cents per pound under paragraph 736, *supra*.

Judgment will be rendered accordingly. It is so ordered.