UNITED STATES *v.* JUDSON SHELDON CORP. (No. 4507) [1]

---

[1] C. A. D. 318.

United States Court of Customs and Patent Appeals, November 5, 1945

*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue*, special attorney, of counsel), for the United States.
*Eugene R. Pickrell* for appellee.

[Oral argument October 2, 1945, by Mr. Donohue and Mr. Pickrell]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The First Division of the United States Customs Court sustained the importer's (appellee's) protest against the classification and assessment of duty upon certain imported beef liver extract, C. D. 871. The collector classified the same as an advanced drug under paragraph 34 of the Tariff Act of 1930, and assessed the same with duty at 10 per centum ad valorem. The importer's protest claimed the merchandise free of duty under paragraph 1669 of said act as a drug in a crude state, "not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture." The Government has here appealed from the judgment of the trial court.

The imported merchandise, represented by Exhibit 1 introduced in evidence, was prepared by grinding crude raw or frozen beef livers in Brazil, South America, adding water, and heating the mixture to a temperature between 170° and 180° F. for thirty minutes. The water portion was strained off, not clarified, but was separated from the coagulated meat portion. The meat portion was further washed with water to recover additional soluble matter. The first liquid portion, plus the washing, was then concentrated in a vacuum to a solids content of between 55 and 60 per centum. The material was then packed in suitable containers, kept in a refrigerated space at a temperature of about 40° F., and shipped to this country.

The purpose of the treatment of the livers is to extract certain well-known vitamins of therapeutic value in the treatment of anemia, malnutrition, and other physical difficulties. The extract as imported

is in a pasty form, not edible, and unsuited to be used as such as a medicinal. It must be further treated upon arrival in this country to get it in such condition that it can be accurately and safely prescribed by a physician, in a predigested state. The instant importation and others of the same material (containing nothing except that which came from the beef livers) were taken to the Wilson Laboratories in Chicago and there diluted with water, "the pH adjusted to the desired value," and enzymes manufactured by Wilson Laboratories were added. After the enzymes were added it was kept at a certain temperature for several hours to permit enzymic action. It was then heated to destroy the enzymes and avoid their further activity. The enzymes act as a catalyst and have the effect of predigesting the extract and making it readily assimilable. The material was then filtered until it was very clear, then concentrated to a solids content of about 65 per centum and sold by the Wilson Laboratories in bulk, in drums, to pharmaceutical manufacturers, who, after adding ferrous iron, alcohol, and malt extract and other ingredients, make it into tablets, capsules, etc., to be prescribed by the physician for the above-mentioned disabilities. The product sold by the Wilson Laboratories is of value solely on account of its therapeutic qualities which were extracted from the beef livers. The vitamins in the imported article are in no way different from those in the raw liver.

The beef livers from which the extract is produced are of the kind of livers which, in Brazil and in this country, are edible as food, and the insoluble portion remaining after the extraction is used for food purposes for animals and humans.

The two paragraphs of the Tariff Act of 1930, paragraphs 34 and 1669, read as follows:

PAR. 34. Drugs such as barks, beans, berries, buds, bulbs, bulbous roots, excrescenses, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or *animal origin;* any of the foregoing which *are natural and uncompounded drugs and not edible,* and not specially provided for, but *which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: Provided,* That the term "drug" wherever used in this Act shall include only those substances having therapeutical or medicinal properties and chiefly used for medicinal purposes: *And provided further,* That no article containing alcohol shall be classified for duty under this paragraph. [Italicized words, except the last four, are supplied.]

PAR. 1669. Drugs such as barks, beans, berries, buds, bulbs, bulbous roots, excrescenses, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, logs, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of *animal* or vegetable *origin;* all the foregoing *which are natural and uncompounded drugs* and not edible, and not specially provided for, *and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever*

*beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: Provided,* that no article containing alcohol shall be admitted free of duty under this paragraph. [Italicized words, except the last one, are supplied.]

It is conceded by all that the importation is a drug, and the sole question involved is whether or not it has been advanced in value or condition by the steps mentioned in the statute so as to bar it from free entry.

It is the contention of the Government, as we understand it, that the beef liver in Brazil was the crude drug and that the extract produced as aforesaid is an obvious advancement from the crude drug liver. In the Government brief we find the following: "If the beef livers are regarded as drugs, then assuredly the merchandise at bar is a therapeutic agent derived therefrom and advanced by a series of treatments. This would bring it plainly within paragraph 34."

It is argued in the Government's brief that the classification of the collector raises the presumption that the beef livers from which the goods at bar were extracted were crude drugs and in the absence of proof to the contrary it must be assumed that the crude drugs have been advanced. The weakness of the Government's contention is assuming a premise which the record definitely refutes. The livers from which the instant extract was taken were not crude drugs, *F. W. Myers & Co., Inc.* v. *United States,* 29 C. C. P. A. (Customs) 30, C. A. D. 167. They were edible, of the kind that is used in Brazil and here for food purposes, and the classification of the collector that the instant merchandise is an advanced drug does not necessarily imply that the collector found that the livers were drugs. His classification might imply that he found that a drug, made from a material which was not a drug, had been advanced after it became a drug.

The importer introduced testimony, which is unrefuted, to the effect that, by reason of the action of the Government of this country, beef livers from Brazil may be imported into this country only for pharmaceutical purposes owing to the prevalence of certain cattle diseases there, and that if the livers are imported for pharmaceutical purposes, it must be done under such regulations as to make it impracticable to package and transport the livers to the place where the extract is further treated, without destroying the desired properties in the same. In the regulations it is provided that livers may. be imported if heated to 156° F. Concerning the cooking of the livers, Dr. David Klein, a chemist of renown, general manager of the Wilson Company, stated:

"That is impractical; you cannot heat the whole liver to any such temperature with safety, and even if the livers were heated to that temperature they would have to come in under freezing conditions. They would have to be kept in a frozen form, which makes it as objectionable to send in the heated liver as it would be to send in the unheated liver because space of that low temperature is not

available. It is very difficult to get freezer space from Brazil, from South America, to bring in the frozen livers and to bring them to destination in safe condition."

He also stated that the liver could not be ground and dried because valuable properties would be lost and that to freeze the whole liver was impracticable owing to the lack of shipping facilities and refrigerator space, since they would have to be kept at a temperature far below freezing. It is shown by the record that the instant extract does not need to be frozen, takes up one-fifteenth of the space of the liver, and can be shipped safely across tropical territory at a temperature of 40° F.

It is the position of the importer, as it was of the trial court, and their respective positions are abundantly supported by the uncontroverted testimony of record, that absolutely nothing was done in preparing the imported article except that which is necessary to extract the desired ingredient and recover it in its crudest, simplest state, that a crude drug emanated from a beef liver and that it was not advanced so as to deny it free entry under the terms of the pertinent tariff provision.

In oral argument, Government counsel was asked what was done to advance the drug after the beef livers had been treated by grinding and separating the soluble portion from the insoluble portion. The answer was that it was concentrated—the water was removed. The record shows that after the arrival in this country, water must be added. It is not illogical to conclude that the removal of the water was the reverse of an advancement, and, in any event, it was not, in our opinion, and we so hold, an advancement by any of the processes mentioned in the statute beyond that which was essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture. Would Congress contemplate that huge cakes of ice containing the thin liquid be shipped here as a crude drug? We think not. It seems clear to us that the extracting of the vitamin-containing, soluble portion of the liver, which is nothing "other than to get it by itself," or, at most, bringing it to a condition where it could be safely packaged and transported, does not remove the drug created by the extraction from its crude condition into one which Congress contemplated would be so advanced by processes applied abroad as to justify its being given a dutiable status. See *United States* v. *Sheldon & Co.*, 2 Ct. Cust. Appls. 485, T. D. 32245. In some respects that case is easily distinguishable from the one at bar, but in other respects it is very much in point, particularly that portion dealing with the degree of *crudeness.*

The importer relies heavily for supporting authority for its position on the decision of this court in *Vandegrift & Co.* v. *United States*, 13

Ct. Cust. Appls. 30, T. D. 40865. The syllabus of the case properly explains the holding of the court and reads as follows:

Certain inedible portions of cattle, such as glands, were imported, dried and ground, for the purpose of extracting medicine from them. They are drugs of animal origin, classifiable under paragraph 34, Tariff Act of 1922, if advanced, and under freelist paragraph 1567 if not. With the evidence showing that no way of transporting them was practicable except ground and dried, and that the ground and dried merchandise was less desirable than when fresh or frozen or dried whole, they must be held "not advanced in value or condition * * * beyond that essential to the proper packing * * * and the prevention of decay or deterioration pending manufacture." Accordingly they are classifiable under paragraph 1567.

The principle in that case we think is controlling in the instant case, and Government counsel has not seen fit to discuss that case at any great length. It will be observed, however, that in that case it was not questioned by the importer that the pituitary and ovarian cattle glands imported from South America were drugs. In this case no such assumption is permissible, but even then this court held that the elaborate treatment to which those animal drugs were subjected in South America did not constitute an advancement within the meaning of the language used in the Tariff Act of 1922, which, in respects with which we are here concerned, is identical to that of paragraphs 34 and 1669 of the Tariff Act of 1930 quoted *supra*.

The trial court properly pointed out that in the case of *F. W. Myers & Co., Inc.* v. *United States, supra,* the decision of the issue turned upon the fact that there was nothing in the record to show that the beef livers, before being treated, were drugs but that, on the contrary, livers imported from Canada for pharmaceutical purposes and for food purposes were identical—both healthy beef livers, prepared and frozen in the same manner for preservation and shipment. We held that those beef livers when they came in were meat and not drugs. The case has little if any bearing upon the instant issue except that it sustains our view that the Government's contention that the beef livers from which the instant extract is made were crude drugs is fallacious.

The case of *Geo. S. Bush & Co., Inc.* v. *United States,* 32 C. C. P. A. (Customs) 56, C. A. D. 285, referred to in the decision below and briefly discussed by the Government, has no direct bearing on the instant issue. There, dogfish-liver oil was classified as drugs advanced by the collector. Dogfish livers, from which the imported oil was extracted, were upon that record regarded as a crude drug and there was no effort on the part of the importer to prove that from this state it had not been advanced to the extent only that was necessary for packing and transportation. On the contrary, the record showed that the crude drug, dogfish liver, had been macerated, treated with live steam, and by elaborate separating processes the oil was sepa-

rated from the water and solids; that the product was 99 per centum pure oil and that the solid portion and water were discarded as useless. That case is important only as illustrative of the fact that there the crude state of the drug was when it was a liver, which is not true in the instant case, and which thought strengthens the conclusion in the instant case that in the processes described as carried on in Brazil a crude drug first appeared when the soluble portion of the liver was extracted.

By the language used in the last quoted sentence it is not meant to suggest that this court would or would not entertain a different view or arrive at a different conclusion if the livers from which the instant extract was taken had in fact been a crude drug. Upon the instant record it is not necessary for us to further discuss this phase of the case.

The Goverment has cited no authority to support its position but has contented itself with discussing certain aspects of cases which it does not regard as controlling. For instance, *United States* v. *Merck*, 66 Fed. 251, wherein the juice of a fruit was evaporated into solid cakes of elaterium, which cakes were held to be free of duty as a crude drug, and *United States* v. *R. Hillier's Son Co., Inc.*, 16 Ct. Cust. Appls. 103, T. D. 42762, where powdered quillai bark was held to be an advanced drug since the bark itself, the crude drug, had been and could be imported in its crude condition without any danger of decay or deteriotation.

The Government makes an added contention, citing *Jones* v. *The Collector*, 6 Treas. Dec. 568, T. D. 24533, that a crude drug is that which contains a therapeutic agent of value, urging further that even if livers were not crude drugs under paragraph 1669 and hence not free of duty they are drugs nevertheless by reason of their pharmaceutical value. The last above-cited decision is clearly inapplicable here, for one reason if no other, because of the fact that the tariff act of 1897, which was there involved, did not provide a definition of a drug which limited the term, as does the instant statute, to only those substances "having therapeutic or medicinal properties and chiefly used for medicinal purposes."

Red cedar is a prolific source of a well-known drug, red-cedar oil, and yet the red-cedar tree or log does not seem to aptly fall into the category of "drugs." Red-cedar lumber is produced in enormous quantities in many parts of the world and is used to make moth-proof chests, lead pencils, fence posts, furniture, and many other things. (U. S. Dispensatory, 23rd ed., p. 1411.) From coal tar are derived many kinds of drugs and medicinals; at the same time dyes, stains, perfumes and many other things come from coal tar. How can it be said that coal tar itself is a crude drug merely because it contains a therapeutic agent?

The particular circumstances of this case would seem to suggest that it is not improper to here state that the statutory provisions under consideration clearly indicate a number of ways whereby a crude drug may be *advanced*, and, in our judgment, one of the ways of making such an advancement would be doing just what the Wilson Laboratories did. When they had finished their work it was still a drug, not a medicinal, but one which had been advanced by processes which we think were clearly in the congressional mind when it used the precise and definite language which we have been here considering.

The language in the above-quoted paragraphs with which we are here concerned was in the bill which later became the Tariff Act of 1922 at the time it was introduced. The legislative history of this particular bill in no way throws any light on the congressional intent in the use of such language. We find that a portion of it was in the tariff act of 1897. There, after providing for crude drugs in the free-list paragraph, 548, the following language was used, "any of the foregoing which are drugs and not edible and are in a crude state, and not advanced in value or condition by refining or grinding, or by other process."

In the free-list drug paragraph of the tariff act of 1909, for the first time, appeared substantially the same language as is now found in the Tariff Act of 1930, and we quote the following, "and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture." The same language is found in the tariff act of 1913, and the tariff acts of 1922 and 1930.

At the time Congress was preparing the Tariff Act of 1922 it had before it the "Report of the United States Tariff Commission," entitled *Tariff Information Survey of 1921*, and we find that much of the language here under consideration was suggested in the said report by the Tariff Commission under the heading "Crude Botanical Drug Industry." In the interest of brevity it is not deemed advisable to quote extensively from this report, but the following would seem to be quite pertinent here:

It is not always easy to differentiate between the crude and the advanced product. Paragraph 477 [act of 1913] of the free list provides for "natural and uncompounded drugs in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture." This does not necessarily require the drug to be in its crudest state of occurrence and the initial process or manipulation to obtain the material by itself in the form of an article of commerce does not constitute an advance in value or condition. For example, the Court of Customs Appeals has held that gum resin reclaimed from turpentine, dirt, leaves, and

insects had not been advanced in value or condition. (*U. S.* v. *Sheldon*, 2 Ct. Cust. Appls., 485, 490, and 492.)

The said report is also illuminating upon the subject as to why Congress in the tariff acts of 1922 and 1930 gives a specific and carefully worded definition of the term "drugs." See also page 91, *Summary of Tariff Information, 1921.* Since there is no controversy between the parties here involved about the imported merchandise being a drug, it is not necessary to further discuss the origin or purpose of the definition.

It is our view that the importation is a crude drug made from beef liver and has been subjected to none of the processes mentioned by the statute which advances it in value or condition beyond that essential to the proper packing of the drug and the prevention of decay or deterioration of the same pending manufacture. We think the trial court properly sustained the protest and its judgment in so doing is *affirmed.*