(C. D. 1545)

NAUMES FORWARDING SERVICE *v.* UNITED STATES

United States Customs Court, Third Division

(Decided August 6, 1953)

*Wallace & Schwartz (Barnes, Richardson & Colburn* by *Joseph Schwartz* of counsel) for the plaintiff.

*Warren E. Burger,* Assistant Attorney General (*John J. Antus,* special attorney), for the defendant.

Before EKWALL and JOHNSON, Judges

EKWALL, Judge: These protests, consolidated at the trial, involve concentrated lemon juice imported from Italy on various dates between February 28, 1950, and July 5, 1950, inclusive. It was assessed with duty at 35 cents per gallon on the quantity of unconcentrated natural lemon juice contained therein, as shown by chemical analyses, under paragraph 806 (b) of the Tariff Act of 1930, as amended by the General Agreement on Tariffs and Trade, T. D. 51802. The rate and classification is not protested, but it is claimed that an administrative ruling changed the method previously used to determine the dutiable quantity of such merchandise, resulting in higher duties, and that the change was in contravention of section 315 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, in that no notice was issued by the Treasury Department 30 days prior to the effective date of the ruling.

The pertinent provisions of the tariff act, as amended, are as follows:

PAR. 806 (b) [as amended by the General Agreement on Tariffs and Trade, T. D. 51802]. Concentrated juice of citrus fruits, fit for beverage purposes, and sirups containing any of the foregoing, all the foregoing, whether in liquid, powdered, or solid form:

\* \* \* \* \* \* \*

Lemon, orange, and other (except naranjilla (*solanum quitoense lam*)) _____ 35¢ per gal. on the quantity of unconcentrated natural fruit juice contained therein as shown by chemical analysis

SEC. 315 [as amended by the Customs Administrative Act of 1938]. \* \* \* No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling; \* \* \*.

At the trial, plaintiff called Richard J. Fleischman, manager of the foreign department of Realemon-Puritan Co., formerly known as Puritan Co. of America, the impoiter herein. He testified that the business of the firm is to take concentrated lemon juice and reconstitute it to its original strength and that the company started to import such merchandise toward the end of the summer of 1949 and made six entries in that year. The witness then identified Chicago entries 3163, 1486, 1520, 3076, 1947, and 1485 as entries of such merchandise made during 1949. He explained that the following "ratios" of unconcentrated juice for each gallon of imported juice were used by the collector in liquidating these entries:

| Entry | | |
|---|---|---|
| Entry 3163 | | 5.3 |
| " 1486 | | 5.1 |
| " 1520 | "natural" | 4.3 |
| | "clarified" | 5.2 |
| " 3076 | | 5.4 |
| " 1947 | | 4.9 |
| " 1485 | | 5.2 |

The said entries were received in evidence as plaintiff's collective exhibit 1.

Mr. Fleischman stated that on the strength of the ratios used in those entries, the importer ordered substantial quantities of such merchandise for shipment in 1950. However, in assessing duties on the 1950 entries (those involved herein), the witness said that a ratio of 6 gallons of unconcentrated juice for each gallon of imported juice was used, except in entry No. 1579 of protest No. 185891–K where a ratio of 5½ to 1 was used. The reason for the change, according to the witness, was a letter, dated December 26, 1950, from the Bureau of Customs to the collector of customs at Chicago (plaintiff's exhibit 2).

Mr. Fleischman testified that he knew of no one else who imported this merchandise into the United States and that the dollar volume of his firm's importations in 1949 was $127,373, and in 1950 it was $246,313.

He explained the fact that the invoices are made out on a basis of a 6 to 1 ratio as follows:

When we first approached Italy, we knew that Italy in itself, in its sales to European countries was accustomed to concentrate, let's say somewhere around 4 gallons to one. What we wanted was a much higher concentrate and we specified that we wanted about 6 to 1, but we qualified that by declaring approximate acidity; therefore the 6 to 1 was merely an indication to them of the approximate concentration that we expected in acidity which was specified at that time.

John P. McDonnell, deputy collector in charge of the liquidating division at the port of Chicago, testified that the reason for the liquidation of the present entries at higher ratios than formerly was that the liquidations were based upon analyses reported by the customs laboratory and the witness presumed that they were made in accordance with the letter from the Bureau of Customs, dated December 26, 1950 (plaintiff's exhibit 2).

Foster K. Ballard, assistant chief chemist of the customs laboratory at Chicago, stated that the reason for the change in ratios used in 1950 from those used in 1949 was partially due to the letter of December 26, 1950, that "due to that letter, definite ratios were established which were different from the ratios that had been used before." The witness explained that the letter set out the best current and authentic data on the composition of normal lemon juice and gave certain figures showing the composition of a normal lemon juice. He added that the laboratory reports included in the official papers in the instant case are amended reports, made pursuant to the letter of December 26, 1950. Before receiving the letter, he said, the ratio was determined by using figures published in a book on the subject of the composition of foods. He stopped using those figures upon receipt of the Bureau letter.

Mr. McDonnell was then recalled to the stand and testified that no 30-day notice was issued by the Bureau of Customs in connection with the change in the manner of determining the ratio, as set forth in the letter of December 26, 1950.

According to statements in the said letter, the customs laboratory, in making its determination, had followed U. S. Customs Laboratory Method No. 806.1–48 (Tentative) to ascertain the percentage of solids, total sugars, and acid in the merchandise, and had compared the figures with estimated average percentages of these ingredients found in unconcentrated natural lemon juice, as published in "The Structure and Composition of Foods" by Winton and Winton. However, instructions as to how the proportions should be determined

were requested because the acting chief chemist stated that the percentages of the ingredients in unconcentrated lemon juice varied with the season and other factors, and he believed that a more accurate result would be obtained if the analysis were compared with the analysis of the actual unconcentrated lemon juice from each importation.

The letter continues:

> The Bureau has obtained from trade sources what is believed to be the best current and authentic data on the composition of normal lemon juice now available, which is as follows:
>
>     *       *       *       *       *       *       *
>
> The Bureau, therefore, recommends that you inform the chief chemist at your port of the above data pertaining to the composition of normal lemon juice, and that you return the laboratory reports on all samples of concentrated lemon juice on entries not yet liquidated to the chief chemist for amendment in accordance with such data.

Upon the foregoing record, plaintiff claims that prior to the letter of December 26, 1950, there was an established and uniform practice by which the customs laboratory determined the number of gallons of unconcentrated lemon juice for each imported gallon of concentrated juice; and that the change was in violation of section 315 of the Tariff Act of 1930, as amended, in that no notice was given as provided therein.

To support its claim of an established and uniform practice, plaintiff relies upon 6 entries made over a period of about 2 months at the port of Chicago and evidence to the effect that this importer brought in practically all of the concentrated lemon juice that was imported in 1949 and 1950.

A similar situation was before the court in the case of *Washington Handle Co.* v. *United States*, 34 C. C. P. A. (Customs) 80, C. A. D. 346. In that case, there was evidence of rulings as to the classification of broom handles by 2 collectors in the same district in connection with 28 shipments during a 2-year period and proof that no other merchandise of that type was brought in except by that importer. It was held that an established and uniform practice had not been shown and that, therefore, the administrative practice might be changed without the issuance of a 30-day notice. The court stated further that under section 315 of the Tariff Act of 1930, as amended, such a notice is not required unless the *Secretary of the Treasury* finds that there is an established and uniform practice which would be affected by the change.

In the cases cited by the plaintiff, the evidence showed that a uniform administrative practice had existed for a period of years. In *Seeck & Kade, Inc.* v. *United States*, 66 Treas. Dec. 649, T. D. 47383, the merchandise had been imported and classified as a crude drug for

15 years. Government examiners testified that a long-continued practice had existed. In *Emil Deinert* v. *United States*, 9 Cust. Ct. 411, Abstract 47544, the merchandise had been imported and classified as manufactures of mother-of-pearl for 8 years. The examiner testified that he had been classifying the merchandise as such for 5 years pursuant to instructions issued by the Customs Information Exchange in New York. *United States* v. *Fred Whitaker Company, Inc.*, 40 C. C. P. A. (Customs) 19, C. A. D. 492, involved the method of ascertaining "clean content" of wool. There was evidence that the so-called "visual method of testing" had been used by customs officials from 1922 to 1941.

In those cases it is clear that there was a long-continued administrative practice. Such a practice cannot be spelled out of 6 entries at one port over a period of about 2 months. There was no evidence that customs officials or the Secretary of the Treasury considered that an established and uniform practice existed. On the contrary, it appears that the collector at the port of Chicago (the same port at which the previous entries had been made) had doubts as to the correctness of the method used to determine the ratio of the concentrated to the unconcentrated juice and asked for instructions from the Bureau of Customs. On these facts, there is nothing to warrant a finding that an established and uniform practice existed.

We hold, therefore, that the instructions in the letter of the Bureau of Customs, dated December 26, 1950, and the collector's action pursuant thereto, do not constitute a change in an established and uniform practice which must be preceded by a 30-day notice in accordance with section 315 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938.

The protests are overruled and judgment will be rendered for the defendant.