## MEYERS & CO. *v.* UNITED STATES (No. 2052).[1]

1. EVIDENCE, SUFFICIENCY OF.

   The uncontradicted testimony of two competent and undiscredited witnesses that the importation is commonly used for tanning is sufficient to overcome the presumption of correctness attendant upon the collector's classification denying it such status.

2. BY-PRODUCT LIGNUM EXTRACT USED FOR TANNING.

   Lignum extract, obtained as a by-product from the manufacture of wood pulp from spruce and balsam, containing no alcohol but a substantial amount of tannin and commonly used for tanning, should have been classified by the collector as "extracts of other * * * woods * * * such as are commonly used for tanning" (par. 624, tariff act of 1913) rather than as "waste not specially provided for" (par. 384), notwithstanding that such merchandise is used for other purposes than tanning and that the instant importation was not intended to be used for tanning. It is not classifiable as tannin or as an acid not specially provided for (par. 1), as a chemical compound (par. 5), or as a nonenumerated manufactured article (par. 385).

## United States Court of Customs Appeals, November 23, 1920.

APPEAL from Board of United States General Appraisers, Abstract 43795.

[Reversed.]

*Garry & Wakefield* for appellants.

*Bert Hanson,* Assistant Attorney General (*Samuel Isenschmid,* special attorney, of counsel), for the United States.

[Oral argument Oct. 27, 1920, by Mr. Wakefield and Mr. Hanson.]

Before SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

The merchandise now in question consists of a dark, heavy liquid, which was imported into this country in tank cars from Canada. It was invoiced as "Lignum extract," and was entered at the customs as "Lignum extract, by-product from the manufacture of sulphite wood pulp." It was assessed with duty at the rate of 10 per cent ad valorem as "waste not specially provided for" under paragraph 384, tariff act of 1913.

The importers protested against the assessment, claiming among other things a right of free entry for the merchandise under the provision for "extracts of oak and chestnut and other barks and woods other than dyewoods such as are commonly used for tanning," contained in paragraph 624 of the act.

The Board of General Appraisers heard the protest upon evidence and overruled it, from which decision the importers now appeal.

The question which thus presents itself is whether the decision of the board against the importers' contention is so clearly contrary to

---

[1] T. D. 38557 (38 Treas. Dec., 782).

the evidence as to require a reversal. Both the board and the Government's counsel intimated doubt as to the correctness of the collector's action in assessing the article as waste, but nevertheless under the well-known rules of customs procedure it devolved upon the importers to establish at the trial not only that the assessment was erroneous, but also that the claim made by them in the protest was true in fact and law, and this the board held they had failed to do. The present question therefore is whether the evidence contained in the record sufficiently establishes the importers' contention to require a decision in favor of the protest, notwithstanding the presumption which favors the collector's assessment, and notwithstanding the adverse finding of the board upon the evidence.

The following is a copy of paragraph 624, with the classification upon which the importers rely in italics:

624. *Tanning material:* Extracts of quebracho, and of hemlock bark; *extracts of oak and chestnut and other barks and woods other than dyewoods such as are commonly used for tanning not specially provided for in this section;* nuts and nutgalls and woods used expressly for dyeing or tanning, whether or not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process; and articles in a crude state used in dyeing or tanning; all the foregoing not containing alcohol and not specially provided for in this section.

It appears without dispute that the imported liquid was first produced as a waste resulting from the manufacture of sulphite wood pulp, and that it was subsequently processed to bring it to its present condition. The following is a brief description of these operations: Spruce and balsam logs are barked, and then reduced to small chips; these are placed in large digesters, and are cooked in liquid calcium bisulphide, an acid; the contents are then forced into a blow pit with a perforated bottom, through which the liquid drains out, leaving the wood pulp in the pit; the liquid thus recovered is conducted to a large storage tank, where certain foreign matters are precipitated; it is then transferred to an evaporation plant, where by means of steam introduced under a vacuum about nine-tenths of the water in the liquid is driven off and various chemical elements are greatly reduced, leaving the material but slightly acid. This final product constitutes the present importation, which, as before stated, is transported into this country in tank cars. According to a chemical analysis contained in the record the liquid contains the following constituents to 100 parts, viz: Tannin, 24.69; nontannins, 29.04; water, 46.27. It is testified without contradiction that the nontannins consist of small amounts of soluble mineral salts and larger amounts of soluble organic matters obtained from the wood. The liquid contains no alcohol.

The foregoing description of the liquid in question leads us at once to the conclusion that it is an extract of the spruce and balsam

woods which are the basis of the operations above set out, and that it plainly satisfies that much of the requirements of paragraph 624, supra. There being no testimony in the record tending to attach to the word "extract" any signification other than the common or dictionary one, we accept the following definition, taken from the Century Dictionary, as apt and correct:

*Extract:* That which is extracted or drawn out. Anything drawn from a substance by distillation, heat, solution, or other chemical or physical process, as an essence or tincture.

A concentration of the principles or elements of anything, a condensed embodiment or representation.

As appears from the analysis above set out, the present material is almost wholly composed of elements which were drawn out of or extracted from the spruce and balsam woods, by means of such processes as are mentioned in the foregoing definition, and the material is plainly an extract of these woods. Nor is it contended that these are dyewoods. This element of the classification contended for by the importers is therefore established.

The next question is whether the imported extract belongs to a class "such as are commonly used for tanning," and not otherwise provided for in the act. And this is the real underlying issue in the case.

The evidence in the record consists of the testimony of witnesses Sigmund Wang, Herbert C. Reed, Francis L. Smith, Joseph Daoust, and B. F. Gamble, all of whom were called by the importers. The Government on its part called no witnesses, but submitted, however, an analysis of the article reported by its official chemist.

In the first place it may be stated that the evidence establishes beyond question that the imported material is at least *suitable* for use as a tanning material, and that it is actually used in tanning operations. One of the witnesses, Joseph Daoust, the president and general manager of a Montreal tannery and shoe factory, testified directly to this fact and exhibited samples of leather which had been tanned by means of a liquid composed in equal parts of the present material and the extract of quebracho. These samples are part of the record. The other testimony also sustains the suitability of the liquid as a tanning material, and, indeed, the record contains no contradiction of that fact. The Government's chemist, after stating his analysis of the article in his official report, says:

According to Prof. Procter, an eminent authority on tanning, such a combination used for tanning gives leather of satisfactory commercial value an excellent appearance.

We are unable to find the original of this quotation from Prof. Procter, but we quere whether the word "an" last above written should not read "and."

A quotation from Allen's Chemical Organic Analysis, volume 5, page 100, which is presented in the Government's brief, also sustains this view, reading as follows:

Recently sulphite cellulose liquors have come into commerce as tanning substitutes (pine-wood extracts). Although these react with hide-powder process, and may even show a result equivalent to 25 per cent tannin, they probably do not contain any tannic acid.

We may repeat that the suitability for use and the actual use of the imported liquid as a tanning material is too clearly established by the record to admit of doubt; the question remains, however, whether, in fact, in this country the article is *commonly* used as such.

Upon this subject the witness, Dr. Reed, an expert of conceded qualifications, testified in part as follows:

By Mr. WAKEFIELD:

Q. Since 1898 you have had a knowledge of the use of these sulphite liquors as tanning materials, materials like the sample analyzed by you?—A. Not since 1898.

Q. Well, for how long a period?—A. Since, I should say, 1909.

Q. 1909?—A. Yes.

Gen. Appr. WAITE: What paragraph is that?

Mr. MULVANEY. 624 the claim is made under.

Q. Have materials like the sample which you analyzed and like these exhibits been used generally in the United States since 1909 in the tanning of leather or the tanning of hides to make leather?—A. They commenced to be used in 1909, or along that time in a small way, and grew rather rapidly up to the present time.

Q. So at the present time materials like this Exhibit 1 you analyzed, covered by your analysis Exhibit 2, have been used as tanning materials in the preparation of leather and the changing of hides into leather, is that true?—A. That is true.

\*  \*  \*  \*  \*  \*  \*

Q. Is this stuff used for anything else besides tanning, or is that its exclusive use?—A. It is used for other purposes; it is used for a road binder.

Q. What is its principal purpose?—A. I should say that the principal purpose is for use in producing leather, in the tanning of leather.

Q. That is its chief use?—A. As far as I know that is its chief use.

By Gen. Appr. WAITE:

Q. Why did they quit producing it, if you know? I understand from the witness preceding you that they built this plant to produce this material, and run it for a few months, and then shut down, and it is still shut down. Do you know why that is? If this is tanning material, that is principally used for that purpose and valuable for that purpose?—A. I can not say why they quit producing it; I can say it is produced in tremendous quantities.

Q. In other places?—A. In other places.

The witness, Dr. Smith, also an expert in this field of applied science, testified in part as follows:

By Mr. WAKEFIELD:

Q. Now, Doctor, will you look at this analysis, Exhibit 2, and state whether or not materials containing the ingredients there shown have any value as tanning material in the preparation of leather, tanning of hides into leather?—A. This analysis would reveal the fact that the extract, that the material examined contained a very high proportion of tannins or leather making material.

Q. Do you know whether such materials as that represented by Exhibit 2 are used generally in the manufacture of leather, in the tanning of hides and in the preparation of leather?—A. Yes, to a very large extent.

It may be observed that the foregoing statements stand uncontradicted in the record, and upon them, taken together with the other testimony in the case, we conclude, that it is true as claimed by the Government that the use of sulphite liquors in manufacturing has been in a somewhat experimental stage and that the producers have been seeking a market in various industries for it; also that it has been used as a binding material for briquets and for other like purposes, and indeed the present shipments were not intended for tanning purposes; but nevertheless it has come to be chiefly used in this country in the tanning of leather, and commencing with the year 1909 or thereabouts it became recognized in the trade as a suitable and practical tanning material and its use as such rapidly grew throughout the country; and that at the time of the present importation this use was doubtless not universal, but it was nevertheless common in the industry. And according to our interpretation of the record these facts appear with sufficient clearness, standing uncontradicted as they do, to justify the importers in the claim for free entry contained in the protest, and to require a reversal of the board's decision.

We have not overlooked the fact that the Government claims the importation to be dutiable alternatively as tannin at 5 cents per pound, or as an acid not specially provided for at 15 per cent ad valorem, or as a chemical compound at 15 per cent ad valorem, or as a nonenumerated manufactured article at 15 per cent ad valorem. These claims are presented for consideration in case the assessment as waste should be disapproved. We need not discuss these alternative claims in detail. We may say in general that according to our view the article is not unenumerated, but responds directly to the indicated enumeration in paragraph 624, supra, and furthermore, we do not think that it is classifiable as tannin, or as an acid, or as a chemical compound, and moreover the enumeration under which we place the article is more specific than these.

The decision of the board overruling the protest is accordingly *reversed*.