(C.D. 2459)

C. S. EMERY & COMPANY v. UNITED STATES

United States Customs Court, Third Division

(Decided May 26, 1964)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Samuel D. Spector* and *Harold L. Grossman*, trial attorneys), for the defendant.

Before DONLON and RICHARDSON, Judges

DONLON, Judge: Identification by plaintiff of the merchandise at issue was made only by claim of plaintiff's counsel, and the official papers are not in evidence. However, defendant's brief concedes that the protest merchandise "consists of three separate and distinct materials, identified on the invoices as Lignosol BD, Lignosol XD, and Lignosol TSD, exported from Canada by Lignosol Chemicals, Ltd., and generically described on said invoices as evaporated lignum extract suitable for use in tanning containing no alcohol." (Defendant's

brief, p. 1.) The assertion of plaintiff's counsel and documents that are not in evidence do not have the force of proof; but, absent proof, we may accept defendant's concession as to what the merchandise is.

Plaintiff introduced into evidence three exhibits (1, 2, and 3), which were not identified by plaintiff's witness as being representative of the imported merchandise. They were, however, identified as representative of Lignosol BD (exhibit 1), Lignosol XD (exhibit 2), and Lignosol TSD (exhibit 3). These are the merchandise articles which defendant concedes are in issue. On that basis, we proceed to review the record and consider the issues raised by the amended protest.

These three Lignosols are extracts of a mixture of spruce and balsam woods, processed from sulphite pulp waste, a byproduct of paper manufacture. Sulphite pulp waste is described as sulphite liquor.

To make Lignosol BD, the sulphite liquor is first screened to remove the pulp particles. Then it is evaporated, certain volatile components being removed in the process of evaporating the liquor to a 50 percent solution. That solution is then dried, and the resultant powder is represented by exhibit 1, described as Lignosol BD. (R. 10.)

To make Lignosol XD, the sulphite liquor, after removal of the pulp particles, is treated with sulphur dioxide in order to remove calcium from the liquor. In this treatment, sodium replaces the calcium. Thereafter, the processing is like that described for Lignosol BD, i.e., concentration of the solution by evaporation, and drying into a powder. The powder is represented by exhibit 2, described as Lignosol XD. (R. 11.)

To make Lignosol TSD, the sulphite liquor, after removal of the pulp particles, is treated with sulphur dioxide and liquid ammonia is then added. The calcium bisulphite precipitates, leaving ammonia in place of the calcium. Thereafter, as for Lignosol BD and XD, the solution is concentrated by evaporation and dried to powder, represented by exhibit 3, described as Lignosol TSD. (R. 12.)

All three were identified as Lignosulphonates, that is, materials produced from spent sulphite liquor. (R. 7.) Proofs are lacking as to entry dates. Both parties, however, argue on the basis of entries both before September 29, 1957, and thereafter. We accept this as a concession of that fact. Significance of the date lies in a change, then effective, in the dutiable status of the tariff classification on which plaintiff bases its protest.

The merchandise was classified in liquidation under paragraph 1558, as modified, as articles, manufactured in whole or in part, not specially provided for, dutiable at 10 percent.

The protest, as originally filed, claimed that lignum extract or similar merchandise, regardless of entry date, is properly free of duty under paragraph 1670, Tariff Act of 1930, as amended.

On September 7, 1961, plaintiff's motion to amend was granted, and the following claim was added to the protest:

That prior to the liquidation of the entries involved in this case merchandise such as or similar to the merchandise covered by this protest was assessed under Par. 38, Tariff Act of 1930, as modified by T.D. 54108, at 7% or 6½% or 6% ad valorem under an established and uniform practice, and that the liquidation of the entries in question is contrary to the provisions of Section 315(d), Tariff Act of 1930, as amended.

When trial opened at St. Albans, Vt., on October 2, 1961, the presiding judge granted plaintiff's further motion for protest amendment, adding to the already amended protest the following additional claim:

That prior to the liquidation of the instant entries, merchandise such as or similar to the instant merchandise, if entered prior to September 29, 1957, was liquidated under Par. 38 and T.D. 54108 at 7% or 6½% or 6% ad val., and if entered after September 28, 1957, was liquidated free of duty under Par. 1670 and Public Law 85–235, under an established and uniform practice, and therefore the instant liquidations are contrary to Sec. 315(d), Tariff Act of 1930 as amended.

Further, that the merchandise entered prior to September 30, 1957, is dutiable under Par. 38 and T.D. 54108 at 7% or 6½% or 6% ad val. directly or by similitude.

It appears, therefore, that plaintiff makes the following protest claims:

1. As to "lignum extract or similar merchandise" entered prior to September 30, 1957, that it is dutiable under paragraph 38 and T.D. 54108 at one of three alternative rates, namely, 7 percent, 6½ percent, or 6 percent, directly or by similitude.

2. As to such merchandise entered on and after September 30, 1957, that it is duty free under paragraph 1670, as amended. (Note: The date should be September 29, 1957.)

3. That there was an established and uniform practice for classification of such merchandise as claimed, and the liquidation, therefore, is contrary to section 315(d).

Before taking up the similitude claim or the claim to an established and uniform practice, we turn to consideration of plaintiff's two direct classification claims. The basis of these direct classification claims is found in the following two statutory provisions:

Paragraph 38, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade (T.D. 54108), effective June 30, 1956:

Extracts, tanning, not containing alcohol:
  Chestnut, divi-divi, hemlock, and other extracts, decoctions, and preparations of vegetable origin used for tanning, not specially provided for (except urunday extract and not including wattle).

Public Law 85–235 (T.D. 54441) amended paragraph 38, limiting that provision to the enumerated provisions used for dyeing, coloring,

or staining; and also inserted a new subparagraph (b) in paragraph 1670, as follows:

(b) Extracts, tanning: Chestnut, cutch, divi-divi, hemlock, mangrove, myrobalan, oak, quebracho, sumac, valonia, wattle, and other extracts, decoctions, and preparations of vegetable origin used for tanning, and combinations and mixtures of the foregoing; all the foregoing not containing alcohol and not specially provided for. [71 Stat. 516.]

Public Law 85–235 became effective September 29, 1957.

There appears to be no real question that all three forms of Lignosol are extracts, or preparations, of vegetable origin, not containing alcohol. Defendant concedes as much. There is little doubt, from the testimony of record, that these importations of Lignosol preparations were, in fact, actually used for tanning. The controverted legal issue is whether paragraph 38 requires, for classification thereunder, that the *chief* use of the extract, or preparation, shall be for tanning and/or some other of the uses therein enumerated.

On April 1, 1960, the Customs Bureau issued a ruling, an abstract of which was published in T.D. 55091 (10), as follows:

*Lignosulphonates.*—Certain lignin extracts known as lignosulphonates not classifiable under the provision of paragraph 1670(b), Tariff Act of 1930, as amended (T.D. 54441), for other extracts, decoctions, and preparations of vegetable origin used for tanning, unless chiefly used in the United States for tanning purposes. Bureau letter dated April 1, 1960. (417.0).

Plaintiff argues against the concept that *chief use* in the United States for tanning purposes is the true significance of the statutory language "used for tanning." A Treasury ruling is not, of course, legally conclusive of the position which the ruling recites. However, these entries, which had not then been liquidated, were, subsequent to this ruling, liquidated as extracts or preparations not *chiefly* used for tanning purposes and, hence, not entitled to paragraph 38 or 1670 (b) classification.

Our first task is to determine the meaning of the statutory words "used for tanning." Are they properly interpreted by defendant, so as to require proof showing chief use? If so, has plaintiff established proof of chief use for tanning purposes as to all or any of the three lignosulphonates of this litigation? If the words "used for tanning" in paragraphs 38 and 1670 (b) have a more limited meaning than that which defendant asserts, has plaintiff, by its proofs, brought the three lignosulphonates of this litigation within that meaning?

In support of its contention that paragraphs 38 and 1670(b) are governed by application of the doctrine of "chief use," defendant cites both judicial precedents and legislative history as excluding the interpretation for which plaintiff contends, namely, that "used for tanning" means suitable for use for tanning. We proceed first to review of the cases cited on that issue in the briefs.

Both parties cite *Meyers & Co.* v. *United States*, 10 Ct. Cust. Appls. 216, T.D. 38557. The merchandise of the *Meyers* litigation was described as lignum extract. The protest claim was that the lignum extract was duty free under paragraph 624, Tariff Act of 1913. That was the classification provision of that act which enumerated vegetable extracts "*commonly used for tanning* not specially provided for *in this section* * * *.*" [Emphasis supplied.] It is noted that the statutory language of the 1913 act before the court in the *Meyers* case, was not "used for tanning," as it is here.

The issue, then, was whether the lignum extract in the *Meyers* case was *commonly* used for tanning, and also whether it was an article that was specially provided for in the same "section" of the law. The opinion of the court must be read in the context of the *Meyers* issue, different from the issue here by reason of somewhat different statutory language.

The Board of General Appraisers, on trial of the case (*Meyers & Co.* v. *United States*, 38 Treas. Dec. 898, Abstract 43795), held, in its abstract opinion, "that the material does not answer the description of any of the tanning materials enumerated under paragraph 624." This leaves some uncertainty as to whether the statutory standard of *common* use for tanning, or some of the other criteria of paragraph 624 of the Tariff Act of 1913, was the basis of the board's decision.

There is no such uncertainty, however, as to the basis on which the appeals court, reversing the board, held that the lignum extract should be classified under paragraph 624. All necessary criteria of the tariff provision (paragraph 624 of the 1913 act) were found to subsist. As to the requirement that the lignum extract shall be one *commonly* used for tanning, the appeals court found, on the record before it, that the extract was suitable for tanning and that it was actually used for tanning. The court discussed sulphite liquors, and said that tanning is a purpose for which sulphite liquors are "chiefly used."

On the issue of use, the court said:

* * * we conclude, that it is true as claimed by the Government that the use of sulphite liquors in manufacturing has been in a somewhat experimental stage and that the producers have been seeking a market in various industries for it; also that it has been used as a binding material for briquets and for other like purposes, and indeed the present shipments were not intended for tanning purposes; but nevertheless it has come to be chiefly used in this country in the tanning of leather, and commencing with the year 1909 or thereabouts it became recognized in the trade as a suitable and practical tanning material and its use as such rapidly grew throughout the country; and that at the time of the present importation this use was doubtless not universal, but it was nevertheless common in the industry. And according to our interpretation of the record these facts appear with sufficient clearness, standing uncontradicted as they do, to justify the importers in the claim for free entry contained in the protest, and to require a reversal of the board's decision.

We have not overlooked the fact that the Government claims the importation to be dutiable alternatively as tannin at 5 cents per pound, or as an acid not specially provided for at 15 per cent ad valorem, or as a chemical compound at 15 per cent ad valorem, or as a nonenumerated manufactured article at 15 per cent ad valorem. These claims are presented for consideration in case the assessment as waste should be disapproved. We need not discuss these alternative claims in detail. We may say in general that according to our view the article is not unenumerated, but responds directly to the indicated enumeration in paragraph 624, supra, and furthermore, we do not think that it is classifiable as tannin, or as an acid, or as a chemical compound, and moreover the enumeration under which we place the article is more specific than these. [*Meyers & Co.* v. *United States, supra,* at p. 220.]

The *Meyers* case holds, then, that lignum extract was, at that time and on the record there before the court, commonly used for tanning, although there were also other uses. There is no finding as to what the *chief* use of lignum extract was. There is a statement that tanning is a chief use of sulphite liquors.

Other cases cited by both parties in their briefs, as to meaning of the term "used for," include the following:

*United States* v. *Lehn & Fink,* 9 Ct. Cust. Appls. 309, T.D. 38240.
*United States* v. *Steinberg Bros.,* 47 CCPA 47, C.A.D. 727.

Defendant's discussion of the *Lehn & Fink* case turns only on its relevance to an established and uniform practice, which is not the proposition for which plaintiff cites it. We do not have the benefit of defendant's views as to the applicability here of the construction, by our appeals court, of the use language there in issue.

In the *Lehn & Fink* case, the issue was whether an article was classifiable as a preparation or mixture "*used in the manufacture* of, but not marketable as, perfumes or cosmetics"; a provision found in paragraph 49, Tariff Act of 1913. [Emphasis supplied.] As to the argument of the Government that this provision required proof of *chief use* in manufacture, our appeals court said:

* * * The board in disposing of the case were of opinion that the importation did not fall under paragraph 49, because it was not chiefly used in the manufacture of perfumery or cosmetics. That, however, is not required by the paragraph. They did find that it had a substantial use in the manufacture of perfumery, and as it is concededly synthetic and odoriferous or aromatic, we think it naturally falls under the provisions of paragraph 49. [P. 311.]

In *United States* v. *Steinberg Bros., supra,* the use language construed was that of the similitude provision, paragraph 1559. That provision, as effective with respect to the entry before the court in the *Steinberg* case, provided for similitude classification of a nonenumerated article "which is similar * * * in * * * the use to which it may be applied" to an enumerated article that is chargeable with duty. The trial court (*Steinberg Bros.* v. *United States,* 41 Cust. Ct. 128, C.D. 2030) said:

We have considered and agreed with the law cited by plaintiff that in cases

involving similitude by use the similarity in use must be substantial. The record in the case at bar amply supports the fact that nylon knitted fabric is substantially similar in use to silk knitted fabric, as that product was used. [P. 135.]

Our appeals court, affirming, said:

On the question of similitude of use, the record shows that knit silk fabrics were used, at the effective date of the Tariff Act of 1930, to manufacture hosiery, gloves, and lingerie such as underwear, blouses, brassieres, girdles, jabots, nightgowns, slips and petticoats. The record shows that knit nylon fabric is used today for the manufacture of the identical articles. [*United States* v. *Steinberg Bros.*, *supra*, 47 CCPA 47, C.A.D. 727, at p. 50.]

There has been considerable litigation over the use aspects of certain *eo nomine* tariff enumerations. Typical, we believe, are the cases involving the tariff enumeration of tableware, which long has been held to be a use provision. In a recent case, *United States* v. *Bruce Duncan Co., Inc., et al.*, 50 CCPA 43, C.A.D. 817, our appeals court said:

* * * it seems to us the clear intent of the act was that "tableware", i.e., "ware" then used in the service of "meals" at a table, is properly descriptive of the present uses of "ware" such as the imported "snack sets." Such sets are particularly convenient for carrying a light snack from a point of service, such as the kitchen, to wherever the desired eating place happens to be. We do not agree with the contention of the importer that the trays or plates of the snack sets are so particularly designed as to be suited to be held only in the user's hand or user's lap and would not be used as "ware" in serving a "meal" at a table. The imported snack sets, in usage, could indeed be held by the user, but so can conventional items of "tableware". In both instances, however, it is likely that they would more conveniently be placed on a small coffee table, card table, snack counter, snack table or a "T.V. table". [P. 49.]

Another instance of *eo nomine* classification by use, is *United States* v. *Quon Quon Company*, 46 CCPA 70, C.A.D. 699, where imported baskets, the use of which was as tabletops, were held classifiable as tabletops rather than as baskets.

None of these *eo nomine* situations is precisely the situation here. In years gone by, on a record before it then, our appeals court held that, in fact, lignum extract was commonly used for tanning. (*Meyers & Co.* v. *United States*, *supra*.) Subsequently, Congress struck from the statute the limiting word "commonly," so that the phrase we now construe is merely "used for tanning." Does that signify an intention on the part of Congress to substitute the word "chiefly" for the word "commonly," as defendant argues. Nothing cited to us by counsel persuades us that this was the congressional intention when it enacted the Tariff Act of 1922, from which the word "commonly" (as to use for tanning) was omitted.

While the use phrase of the Tariff Act of 1913, construed in *Meyers & Co.* v. *United States*, *supra*, was "commonly used in tanning," it

should be noted how varied was the "use" language of the 1913 act in connection with tariff enumeration of dyeing and tanning extracts and preparations. Paragraph 30 of that act provided for "extracts of vegetable origin *suitable for* dyeing, coloring, or staining" [emphasis supplied]; and paragraph 624 provided for extracts of wood "such as are *commonly used* for tanning" [emphasis supplied]. The latter is the language that was construed in the *Meyers* case.

The Summary of Tariff Information, 1921, which was submitted January 31, 1922, by the United States Tariff Commission to the Senate Committee on Finance, relative to H.R. 7456, as it had been passed by the House of Representatives on July 21, 1921, contains the following comment as to paragraph 36 of H.R. 7456, under the title "Extracts, Dyeing and Tanning," at page 105, *et seq.:*

> *General.*—Dyeing and tanning materials of vegetable origin bear a close relationship as to origin and process of manufacture and use. The extracts are prepared from barks, woods, and fruits by treatment with hot water followed by evaporation to a liquid of desired density or a solid. Tanning and dye extracts are frequently made in the same plant with the same equipment. In the tanning agents the active ingredient is tannin, while in the dyeing materials coloring matter is sought. Most of the extracts contain both coloring matter and tannin and many are used for both tanning and dyeing; hence any tariff classification based on use involves administrative difficulties and results in litigation.

> All raw materials for manufacture of these extracts are free under the act of 1913 (par. 624). The extracts received in that act a different tariff treatment, depending on their use as a dyeing or tanning material. "Extracts of vegetable origin suitable for dyeing, coloring, or staining, not specially provided for," are dutiable at three-eighths of one cent per pound under paragraph 30, while extracts of vegetable origin, "such as are commonly used for tanning" not specially provided for, are free of duty under paragraph 624. This attempt to classify on basis of use has resulted in litigation.

> To facilitate customs classification and to avoid litigation these very similar products were given uniform tariff treatment in H.R. 7456.

Except that the duty rate was increased from a rate of 11 percent in the bill as it had passed the House, to 15 percent in the bill as enacted, and that sumac, saffron, safflower, and saffron cake extracts were designated, additional to the articles enumerated in the House bill, there was no change in the language of paragraph 36. That is to say, there was no change in the phrase under review here, namely, used for tanning.

Paragraph 38 of the Tariff Act of 1930 is identical with the Tariff Act of 1922 in respect to tanning *use* language, and so is Public Law 85–235, which became effective September 29, 1957.

In 1958, Congress enacted further amendment of this tariff provision (Public Law 85–645), which was approved August 14, 1958, adding a classification of eucalyptus extracts and preparations "(irrespective of their chief use) suitable for use for tanning * * *."

Effectiveness of this extension of the free list to entries that had not been liquidated on August 14, 1958, or as to which liquidation had not then become final, is irrelevant here, since there is no claim or proof that these are eucalyptus extracts or preparations.

It is relevant, however, to observe that, in Public Law 85–645, Congress wrote into one part of paragraph 1670(b) use language which differs importantly from the use language of that part of paragraph 1670(b), which we are considering, and the use language of paragraph 38. As to eucalyptus extracts, Congress made them duty free if they are suitable for use for tanning, irrespective of their chief use.

It is a fundamental rule of construction that we are to give effect to all the language Congress has used. We are not persuaded that, in enacting Public Law 85–645 as to eucalyptus extracts, Congress, as defendant argues, showed that its 1922 intention was that "use for tanning" is limited to "chief use for tanning." The difference in the language Congress employed seems to us to signify that there was some reason for the difference. Congress employs a variety of terms to express its various intentions as to use in different enumerations. We have noted some of these different "use" phrases in the cases already discussed. In writing the 1922 act (predecessor of the 1930 provision which we are considering), Congress had before it, in the 1913 act and with reference to dyeing and tanning materials, such different standards as "suitable for use" and "commonly used." In enacting the 1922 act, both were eliminated and the standard adopted was merely use for tanning.

Nor are we persuaded that the construction of use language necessarily incorporates the use standards requisite for *eo nomine* classification, such as tableware.

Fugitive uses will not, in our view, satisfy the requirement of classification according to use for a stated purpose. Our appeals court, in the *Lehn & Fink* case, *supra*, eschewed both extremes as to use. "Used in the manufacture of" an enumerated article, the court said means substantial use. We accept substantial use as the test here.

Has plaintiff proved substantial use of all or any of the three lignosulphonates of this litigation? We now examine the record, to test the evidence against that standard.

The record shows clearly that there are uses for lignosulphonates, other than for dyeing, coloring, staining, or tanning.

Plaintiff's witnesses were, for the most part, familiar only with the use of lignosulphonates for tanning. On cross-examination, however, Mr. Karl F. Keirstad, a fellow of the Chemical Institute of Canada and technical director of Lignosol Chemicals, Ltd., manufacturer of exhibits 1, 2, and 3, plaintiff's witness, conceded that lignin extract is also used as a dispersing agent, or thinner, and in drilling oil wells;

but he said that lignin extracts, such as exhibits 1, 2, and 3, could not be used as thinners in drilling oil wells, without being considerably modified. (R. 32, 33.)

Testifying for defendant as to uses of lignosulphonates with a calcium or sodium base (exhibits 1 and 2), Dr. Hugh Bayard Hodge, chemist, said that he had no knowledge of their use in tanning, but that they were used in making cleaning compounds, conversion coaters, and dispersants. (R. 140.) He is laboratory manager of Oakite Products, Inc., and said that Oakite makes cleaning compounds and conversion coaters. (R. 137.) He was not asked about uses of lignosulphonates with an ammonium base (exhibit 3).

Mr. Arthur E. Schaefer, chemist, is manager of the organic division of the "Dyestuff and Chemical Division of General Aniline Film Preparation." (R. 145.) Asked if he was familiar with lignosulphonates with calcium, sodium, and ammonium bases, he stated that he is familiar with those having a sodium base, but not with lignosulphonates having calcium or ammonium bases. (R. 147.) The only use of lignosulphonate with a sodium base, as to which he had knowledge, was in the manufacture of a variety of dyestuffs. (R. 148.)

Mr. Jess Beecher testified for defendant that he is director of technical services for the Power Chemicals Division, Drew Chemical Corp., in the business of processing edible oils and fatty acids. He holds a bachelor's degree in chemical engineering from the University of Pittsburgh. (R. 150.) Asked if he was familiar with the lignosulphonates, such as exhibits 1, 2, and 3, he stated that he was familiar only with lignosulphonates with a sodium base (exhibit 2). His company uses sodium lignosol as a dispersant in water treatment, and as a carrier in antifoam products. (R. 152.) He was not familiar with sodium lignosol uses in tanning. (R. 153.)

Mr. Frederick M. Coppersmith, a graduate mechanical engineer, production supervisor in the chemical and pigment division of the National Lead Co., testified that he was familiar with sodium and calcium lignosulphonates (exhibits 1, 2), but not with lignosulphonate with an ammonium base (exhibit 3). He uses sodium and calcium lignosols in the Brooklyn plant of National Lead Co., where they are mixed with other materials for use as storage battery expanders. More recently, National Lead Co. has used these lignosols as a dispersant, but this use was not in the period from 1956 to 1959. He had no knowledge as to the use of lignosulphonates in tanning. (R. 158.)

Mr. Leslie F. Price, quality supervisor in the New York (Bronx) plant of National Gypsum Co., testified. His company makes building materials. He has a degree in chemistry from the University of New Hampshire. He limited his familiarity with lignosulphonates to the calcium base lignosulphonate (exhibit 1). His company has used

that since 1957. National Gypsum Co. uses calcium lignosol as a dispersant and as a water reducing agent in the processing of building materials. (R. 161.) He had no knowledge of the tanning industry.

Mr. Clarence I. Brown, sales representative for United Finish Co., purchaser of these imported articles, testified for plaintiff. He demonstrates his employer's products in connection with his sales duties. He sells Lignosol. He started in the tanning business 30 years ago, and worked up to the position of superintendent of leather manufacture. He has manufactured leathers in five or six tanneries in the United States. He has witnessed the tanning of leather hundreds of times.

Since 1953, he has been selling lignum extracts, such as exhibits 1, 2, and 3, to tanners who work raw hide into side leather, or kidskins, or calfskins, for the most part.

Lignum extracts, such as exhibits 1, 2, and 3, are used as a retan. Mr. Brown described the entire tanning process. After one tannage, mostly with chrome, different materials are used in the retan. These may be quebracho, wattle bark, *spruce extract*, chestnut, among others. Spruce extract is lignum extract. Mr. Brown buys and sells this as Lignosol BD, XD, and TSD.

In retanning, the leather is washed thoroughly and usually "adjusted to a certain pH," by which he explained he meant the scale used to measure acidity or alkalinity of the skins being tanned. The retan material, such as Lignosol, is fed into a large revolving drum "and that is run until it is exhausted," when the leather is washed and finished with oils, taken out, and prepared for drying. In his experience, the only use of Lignosol is in retanning. (R. 58, 59.)

On cross-examination, Mr. Brown said the first process results in the skins being tanned about 90 percent; the retanning completes the tanning process. Retan is a second tanning.

There were introduced in evidence certain books on the subject of tanning, with especial reference to material therein relative to spruce extracts. (Exhibits 7, 8, and 9.) While such works do not have the force of proof, they are guides to interpretation, to which the court may refer, together with dictionaries and other technical articles.

A succinct statement appears in "Modern Practice in Leather Manufacture," by John Arthur Wilson, Sc.D. (exhibit 7), who is described as consulting chemist to the leather industries. Dr. Wilson, in a chapter on Vegetable-Tanning Materials, under the heading "Spruce Extract," says:

Although spruce bark contains from 7 to 15 percent of tanning, the wood untreated appears to contain very little. Spruce wood is used on an enormous scale to make paper. The cellulose fibers of the wood are leached with solutions of lime and sulfur dioxide in order to remove the lignins, which would have a deleterious effect upon the paper, if not removed. The action of the lime and sulfur dioxide upon the lignins renders them water-soluble, in which form they

are known as lignosulfonic acids. The liquors obtained from the extraction of the spruce fibers are known as waste sulfite liquors and have presented serious problems of disposal to paper manufacturers.

However, it was discovered that these liquors when properly prepared have excellent tanning properties. Hurt prepared waste sulfite liquors for tanning as follows: The liquors contain calcium lignosulfonates and free acid. The free acid was neutralized by adding lime, and the liquor was then evaporated, under vacuum, to a gravity of 32° Baumé. The calcium content was then determined and somewhat less than its equivalent of strong sulfuric acid was added while stirring, most of the lime being precipitated as calcium sulfate. The lime then remaining in solution was precipitated by adding the calculated amount of sodium bisulfate. The liquor was then stirred for several hours longer and filter-pressed to remove the precipitated matter, consisting chiefly of calcium sulfate. The liquor thus purified is sold as a tanning agent under the name of *spruce extract.* [Italics quoted.] [P. 283.]

In Webster's New International Dictionary, second edition, 1956, ligninsulphonate (variant spelling of ligninsulphonic acid) is defined as:

*Chem.* Any of various sulphonic acids derived from lignin, as those found in great quantity as calcium salts in sulphite liquor and used in tanning.

The tanning agent is a chemical substance, called tannin, defined in the same dictionary, as follows:

tannin * * * *Chem.* 1. a An amorphous, strongly astringent substance obtained in the form of brownish-white shining scales from gallnuts (of which it constitutes 50 per cent or more), sumac, valonia, and other plant products;—called also *tannic acid, gallotannin, gallotannic acid.* It precipitates gelatin solutions, tans hides, and forms a bluish-black compound with ferric salts. It is of complex structure * * * and yields by hydrolysis gallic acid and (in the case of some preparations at least) dextrose. It is used in tanning, making ink, dyeing, etc., and in medicine as an astringent. b Any of a group of substances including ordinary tannin and characterized by many of its properties;—called also *tannic acid.* They are amorphous or crystalline, are widely distributed in plants, and are used in tanning, dyeing, and inkmaking. Some are made synthetically. 2. *Anal. Chem. & Com.* Any substance that has a tanning effect, as determined by its absorption by hide powder; a tan. [Italics quoted.]

Reading the proofs of record in the light of dictionary definitions and technical authorities, we conclude that the merchandise at issue is three chemically differing extracts, or preparations, that have been processed from sulphite liquor; that to the extent that calcium is "found in great quantities" in the processed material, it is an extract or preparation for which there is substantial use in tanning; that Lignosol BD is such an extract or preparation, retaining the original calcium base; that as to Lignosol TSD, it appears that although calcium, the active tanning agent in lignum, has been removed, and an ammonium base substituted, proofs show tannin as an ingredient, and tannin is an active tanning agent; that, moreover, defendant has adduced no proofs whatever showing any uses of Lignosol TSD

other than for tanning; that as to Lignosol XD, the proofs show that calcium, the active tanning agent of lignum, has been removed and sodium substituted, and there is no proof that sodium is a tanning agent; that proofs show that Lignosol XD has various uses, and there is inadequate proof as to *substantial* use of Lignosol XD for tanning; that, whether entered before, or on and after, September 29, 1957, the proofs show substantial use of Lignosol BD and Lignosol TSD for tanning, but do not show such use of Lignosol XD.

Plaintiff claims that, in the event we should find against the claim for direct classification under paragraph 38 and/or paragraph 1670, this merchandise is, nevertheless, properly so classifiable by similitude in use to the articles that are enumerated in those paragraphs. It is unnecessary for us to consider this similitude claim as to entries of Lignosols BD and TSD, as to which we hold that direct classification is proper.

As to Lignosol XD, there are two points to be made. The first is that our holding against direct classification rests on failure of proof that there is substantial use of Lignosol XD for tanning. If we could so find, the article would be entitled to direct classification by reason of such use. This is one of the articles specifically enumerated in paragraph 38, and later in paragraph 1670, as amended, *except as to use.*

Where a tariff provision contains a specific limitation as to some property of the merchandise, it is not proper to classify thereunder by similitude merchandise which does not have that property. The use provision in paragraphs 38 and 1670, as amended, is not merely descriptive; it is also exclusionary. *Maher-App & Company* v. *United States*, 44 CCPA 22, C.A.D. 630.

The other point to be made here has to do with plaintiff's argument for duty-free classification under paragraph 1670, by similitude. The gist of the argument is that this article, *if used for tanning* in the tariff sense, was on the free list only for a period of 3 years, to September 29, 1960, and, hence, was "chargeable with duty" within the meaning of paragraph 1559, as amended. That paragraph provides for similitude classification of imported merchandise "which is similar in the use to which it may be applied to any article *enumerated in this Act as chargeable with duty* * * *.*" [Emphasis supplied.]

Plaintiff's argument rests on the assertion that tanning extracts were transferred to the free list for 3 years, and so are still "chargeable with duty," except for the transfer. (Plaintiff's brief, p. 5.) Plaintiff has cited no cases in support of this argument.

The fact is that between September 29, 1957, and September 29, 1960, Congress put these extracts, provided they met the tariff test of use for tanning, on the free list. Such extracts, entered within that period, are not chargeable with duty under paragraph 1670.

Plaintiff claims further that T.D. 55091 (10) constituted a change of administrative practice as to these lignosols and, hence, could become effective only with respect to merchandise entered after the expiration of 30 days from the date of publication of the ruling. The difficulty with this argument is that there is no proof that the Secretary of the Treasury found, or indeed could find, that Lignosols BD, XD, and TSD which were not "used for tanning" in the tariff sense, had been classified as if they met that test under an established and uniform practice. At most, we have the testimony of what happened at Newport, Vt., where a customs broker entered articles such as the instant merchandise as a tanning extract under the provisions of paragraph 38, and they were liquidated by the collector there as entered. Although entered as duty free on and after September 29, 1957, there is no proof that they were liquidated as such, even at Newport.

What one collector is shown to have done, is not such proof as is required to show the established and uniform practice which plaintiff claims. *Naumes Forwarding Service* v. *United States*, 42 CCPA 110, C.A.D. 581, affirming *idem*, 31 Cust. Ct. 60, C.D. 1545.

Judgment will be entered sustaining the protest, except as to entries of Lignosol XD, and as to such entries the protest is overruled.