UNITED STATES v. C. S. EMERY & COMPANY (No. 5187)*

United States Court of Customs and Patent Appeals, January 13, 1966

*John W. Douglas*, Assistant Attorney General, *Andrew P. Vance*, Chief Customs Section, *Harold L. Grossman* for the United States.
*Barnes, Richardson & Colburn* (*Joseph Schwartz*, of counsel) for appellee.

[Oral argument November 1, 1965 by Mr. Grossman and Mr. Schwartz]

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Associate Judges.

RICH, Judge, delivered the opinion of the court:

This appeal by the Government is from the judgment of the United States Customs Court, Third Division (52 Cust. Ct. 183, C.D. 2459), insofar as it sustained the importer's protest to the classification of two kinds of lignin extract designated "Lignosol BD" and "Lignosol TSD," exported from Canada by Lignosol Chemicals

———————————

Limited. The judgment overruling the protest with respect to a third material, "Lignosol XD," was not appealed from.

The first question before us is one of law, whether the lignin extracts, to comply with the statutory language "used for tanning," must be *chiefly* used for tanning or only have *substantial* use for tanning. The Customs Court adopted the latter view which the Government says was error. The next question is whether the evidence brings the imports within whichever test is the proper one.

The competing statutes are somewhat complicated, involving a temporary three-year shift of tanning extracts to the Free List, and are the following (our emphasis):

*Classified Under:*

Paragraph 1558, as modified by T.D. 52739, 86 Treas. Dec. 216:
Articles manufactured, in whole or in part, not specifically provided for * * *_____ 10% ad val.

*Claimed Under:*

Paragraph 38, as modified by T.D. 54108, 91 Treas. Dec. 166:
Extracts, tanning, not containing alcohol:
Chestnut, divi-divi, hemlock, and other extracts, decoctions, and preparations of vegetable origin *used for tanning*, not specially provided for (except urunday extract and not including wattle)____ 7% ad. val., or 6½% ad. val., or 6% ad val.

Public Law 85–235, T.D. 54441, 92 Treas. Dec. 250, 71 Stat. 516, *effective September 29, 1957:*
That (a) so much of paragraph 38 of the Tariff Act of 1930 (19 U.S.C., sec. 1001, par. 38) as precedes "not specially provided for" is amended to read as follows:
"Par. 38. Extracts, dyeing: Chlorophyll, fustic, logwood, Persian berry, saffron, safflower, saffron cake, and other extracts, decoctions, and preparations of vegetable origin used for dyeing, coloring, or staining,".
(b) Paragraph 1670 [in the Free List] of the Tariff Act of 1930 (19 U.S.C., sec. 1201, par. 1670) is amended by inserting "(a)" after "Par. 1670.", and by adding at the end thereof the following new subparagraph:
"(b) *Extracts, tanning:* Chestnut, cutch, divi-divi, hemlock, mangrove, myrobalan, oak, quebracho, sumac, valonia wattle, and other extracts, decoctions, and preparations of vegetable origin *used for tanning*, and combinations and mixtures of the foregoing; all the foregoing not containing alcohol and not specially provided for."
Sec. 2. The amendments made by the first section of this Act shall *apply only* in the case of articles entered for consumption, or withdrawn from warehouse for consumption, *during the three-year period* beginning on the thirtieth day after the date of the enactment of this Act.

* * * * * * *

. (Approved August 30, 1957)

The court below held paragraph 38 was the proper classification of the two "Lignosols," BD and TSD, imported prior to September 29, 1957, and that after that date they were free of duty under paragraph 1670(b). The Government contends that proper classification at all times involved was under paragraph 1558, as modified.

The imported merchandise consists of two types of dried (that is what "D" stands for in the above trade designations) product in powder form produced from sulfite pulp waste liquor, a by-product of the paper pulp industry. The exporting manufacturer's literature, in evidence, explains that the principal components of wood are cellulose and lignin, that chemical woodpulps are produced by a process which dissolves the lignin and frees the fibers ("Fibres" to the Canadians), an acid solution of calcium bisulfite being used. This produces calcium lignosulfonate from which the imports are made. "Lignosol BD" is produced by concentrating the pulping liquor by evaporation to 50% solids, thus producing "Lignosol B," and then spray-drying it. "Lignosol TSD" is ammonium lignosulfonate in which the calcium has been completely removed by base exchange. This product was developed specifically for the tanning industry. ("T" in "TSD" stands for tanning.)

## The Question of Law

The precise legal issue is whether, under paragraphs 38 and 1670 (b), the words "used for tanning" require that the chief use of the Lignosols be for tanning. The Government contends that they do, contrary to the holding below that chief use is not required and that "substantial" use for tanning suffices for classification under paragraphs 38 and 1670(b).

. The Government's main point on appeal is that the Customs Court failed to follow long-established judicial precedents to be found in decisions of the courts, from the Supreme Court on down to the Customs Court. The first group of cases relied on consists of five Supreme Court rulings involving paragraph 448 of the tariff act of 1883, 22 Stat. 512, the pertinent portion of which named "Braids, plaits, flats, laces, trimmings, tissues, willow sheets and squares, *used for making or ornamenting hats * * *.*" (Our emphasis.) The cases are: *Hartranft* v. *Langfeld*, 125 U.S. 128 (1888) ; *Robertson* v. *Edelhoff*, 132 U.S. 614 (1890) ; *Cadwalader* v. *Wanamaker*, 149 U.S. 532 (1893) ; *Hartranft* v. *Meyer*, 149 U.S. 544 (1893) : and *Walker* v. *Seeberger*, 149 U.S. 541 (1893). We agree with the Government's characterization of these cases as unqualifiedly holding that the chief, principal, or predominant use governs the classification, notwithstanding an attempt to upset that rule, at that time by the Government, on the ground

4

it was impractical. For a case reviewing and summarizing these cases and further affirming the rule of chief use, see *Meyer* v. *Cadwalader*, 89 Fed. 963 (3rd Cir., 1898).

Next referred to by the Government are several cases in this court where in the statutory provision required consideration of use, either because the statute referred to a use per se or employed a term imputing a use, for example, "agricultural implements" or "tableware." In them this court or its predecessor uniformly deemed a rule or doctrine of chief use to be firmly established and controlling and applied it expressly or by implication. These cases are: *Chrystal* v. *United States*, 5 Ct. Cust. Appls. 489, T.D. 35148; *United States* v. *Boker & Co.*, 6 Ct. Cust. Appls. 243, T.D. 35472; *Brown & Co.* v. *United States*, 7 Ct. Cust. Appls. 309, T.D. 36871; *United States* v. *C. J. Tower & Sons*, 26 CCPA 1, T.D. 49534. To this list we add *United States* v. *The Baltimore and Ohio R.R. Co.*, 47 CCPA 1, C.A.D. 719, and several additional cases therein referred to.

There are cases in other courts and no doubt additional cases in this court which we need not expressly consider. Indeed, appellee seems to admit the existence of the chief use rule in the following paragraph from its brief, which seems to us to state the gist of the contentions before us:

> We suggest that the Government is in error in arguing that it is settled law that *in all cases and under all circumstances* the phrase "used for" must be construed to mean "chiefly used for." Obviously there are exceptions, as for example, when the legislative history indicates otherwise. Clearly this is such a case.

The treatment of this case as an alleged exception implies the existence of the rule contended for by the Government. Our review of the foregoing cases persuades us anew of the existence of the chief use rule which is of such long standing that we seem to have taken it for granted on many occasions. Indeed, the Customs Court in other cases seems to have done likewise. *See Knickerbocker Mills Co.* v. *United States*, 6 Cust. Ct. 262, C.D. 478, and *Knickerbocker Mills Co. et al.* v. *United States*, 11 Cust. Ct. 33, C.D. 788. These two cases involved the paragraph 1670 provision, Tariff Act of 1930, "all articles of vegetable origin used for dyeing, coloring, staining, or tanning," the goods there being dried huckleberries and the use issue being coloring rather than tanning. The importer was held to be under the burden of proving chief use as coloring. Indeed, reading of those opinions will show great similarity of the situations there, with respect to proofs, to the present case. Chief use was not proved and the plaintiff lost.

In considering the statutory construction problem, the lower court opinion refers to none of the above cases, which either hold that chief

use is the proper test or were decided on that assumption. As to precedents relied on by the Government, all it says is, "defendant cites both judicial precedents and legislative history as excluding the interpretation for which plaintiff contends, namely, that 'used for tanning' means suitable for use for tanning." We note, in passing, that the lower court not only rejected the chief use test but also the test of "suitability" for use then urged by appellee and decided that *substantial* use was the test.

We have attempted to analyze the eight pages of the printed record in which the Customs Court discusses the test to be applied to determine by what process of reasoning it reached the conclusion that the test was substantial use, but without much success. With respect to precedents, two cases were given primary consideration: *Meyers & Co.* v. *United States*, 10 Ct. Cust. Appls. 216, T.D. 38557, and *United States* v. *Lehn & Fink*, 9 Ct. Cust. Appls. 309, T.D. 38240. Though the lower court does not seem to have found support for its view in the *Meyers* case, appellee's brief relies on it for various reasons so it merits particular consideration. Contrariwise, though appellee does not give it much weight, the lower court seems to have found support in *Lehn & Fink* and we will therefore discuss it.

*Meyers* was a case involving a concentrated liquid made from sulphite pulp waste liquor, decided by our predecessor court in 1920 under the tariff act of 1913. The import was known as "Lignum extract." From the description given of its manufacture, it appears to us that it was approximately the same thing as the liquid Lignosol B in this case from which the dried Lignosol BD is made. Testimony herein shows "lignum extract" to be merely an older term for "lignin extract." The applicable statute, however, differed from that here, which says "used for tanning," in that it said "commonly used for tanning," the 1922 and subsequent acts having deleted the word "commonly." In *Meyers* the protest, which was sustained, asked for classification under this tanning use provision on the ground the "Lignum extract" was "commonly used for tanning." There was evidence that such was its *chief* use. The court's view of the proofs and the reason for its decision clearly appear from the following quotation (our emphasis):

* * * it has come to be *chiefly used* in this country *in the tanning of leather*, and commencing with the year 1909 or thereabouts it became recognized in the trade as a suitable and practical tanning material and its use as such rapidly grew throughout the country; * * * at the time of the present importation this use was *doubtless not universal*, but it was nevertheless *common* in the industry. And according to our interpretation of the record these facts appear with sufficient clearness, standing uncontradicted as they do, to justify the importers in the claim for free entry contained in the protest, and to require a reversal of the board's decision.

Certainly there is nothing in the opinion to indicate any disagreement with the then existing "doctrine" of chief use, which was not discussed, the fact actually found to exist in the case being that use in tanning was the chief use. A fortiori, the statutory provision "commonly used for tanning" was met.

Of the *Meyers* case the Customs Court opinion says, "There is no finding as to what the *chief* use of lignum extract was. There is a statement that tanning is a chief use of sulphite liquors." This we believe to be a misconstruction of the opinion, which clearly shows that when the court spoke of "sulphite liquors" it was speaking of the imported "lignum extract," which is the initial sulphite liquor evaporated to remove above 90% of its water, according to the *Meyers* opinion. There is no indication that the unconcentrated liquor was shown to be used for any purpose, as such.

In final analysis, the *Meyers* case seems to us to have no bearing on the question whether, under the statute here involved, a showing of chief use is required. Appellee appears to use the decision to indicate that material analogous to the instant imports was classified as tanning material, that such holding was not based on chief use, and that all of the facts present in *Meyers* are present here. As we have shown, chief use was there found to be for tanning even though the different statute there involved did not require it. We are asked by appellee to apply the "same test of classification as tanning extracts * * * as in the *Meyers* case" but the only "test" we can see there is compliance with the 1913 statute which differs from the present statute. We are also told by appellee, "It is plain that Congress did not intend to change the rule of the *Meyers* case." We do not know what is meant by that as we see no "rule" other than meeting the terms of the aforesaid statute. If it be meant that because a concentrated sulphite pulp waste liquor product was classified as a tanning material in 1920 it must be so classified under a similar use provision today, the answer is plain. As we said in the *Baltimore & Ohio* case, supra, in a classification on the basis of chief use "that determination should be made at time of importation." The concurring opinion, which is entirely consistent with everything in the majority opinion, further points out that uses of articles may change and therefore what is the chief use at one time may not be the chief use at another. The evidence here seems to show, in fact, that such a change may have taken place. We fail to see anything in *Meyers* which either supports the Customs Court or is binding on us as a precedent for classification of the imports before us.

*Lehn & Fink* is perhaps the case on which the Customs Court leaned most heavily in deciding that substantial use rather than chief use is the test to be applied. At least it was used to justify that conclusion

and it was said that the case eschewed "both extremes," namely "chief" use and "fugitive" use, as the test. It is difficult to discover what, if any, general proposition *Lehn & Fink* stands for. It was an appeal from the Board of General Appraisers on the classification of synthetic coumarin which was used in substantial quantities both for flavoring and perfumery purposes, not directly but in manufacturing flavors and perfumes. The coumarin had been classified under Group III of section 500 of an act of September 8, 1916, as "flavors." The board sustained a protest and classified it under Group II of section 500, an alternative claim of the importer, whose primary claim was under paragraph 49, tariff act of 1913, as within the provision, "all natural or synthetic odoriferous or aromatic substances, preparations, and mixtures used in the manufacture of, but not marketable as, perfumes and cosmetics * * *." The Government appealed from the board's classification in Group II, contending the collector was right in classifying in Group III, but admitting that if the collector was wrong the coumarin belonged in paragraph 49. The importer, on appeal, also "admitted" (in accord with its primary protest) that if the board was wrong the coumarin was within paragraph 49. The parties were thus in agreement on the *applicability* of paragraph 49 in the event classification elsewhere was not required. The only point in the case having a bearing on this case is the report in the opinion of the appellate court that the board had felt the coumarin did not fall in paragraph 49 because it was not chiefly used in the manufacture of perfumery or cosmetics. Our predecessor court agreed with the board the coumarin was not a "flavor" under Group III and reversed the board's classification in Group II and held classification in paragraph 49 proper, apparently on a theory of relative specificity and in accordance with the agreement of the parties on the applicability of paragraph 49. That holding does not appear to us to have been *based* in any way on *extent* of use. The court merely found that *lack* of proof of chief use in making perfumery or cosmetics did not keep the coumarin *out* of paragraph 49. In no way did it imply that substantial use, per se, would be *sufficient* for classification therein, as is being argued here. This is what it said (emphasis ours) :

We hold that the provision in paragraph 49 for "all natural or synthetic odoriferous or aromatic substances, preparations, and mixtures used in the manufacture of, but not marketable as, perfumes or cosmetics" is *more precisely applicable to this merchandise than are the provisions in Group II of section 500* of the later act. The board in disposing of the case were of opinion that the importation did not fall under paragraph 49, because it was not chiefly used in the manufacture of perfumery or cosmetics. That, however, is not required by the paragraph. They did find that it had a substantial use in the manufacture of perfumery, and *as it is concededly synthetic and odoriferous or aromatic,* we think *it naturally falls under* the provisions of paragraph 49.

We are unable to see in this isolated *Lehn & Fink* opinion any basis for a modification of the general rule of long standing that such an expression as "used for tanning," when *relied* on to bring an import *into* a classification, requires proof that tanning is the *chief* use.

█ We have found nothing else in the opinion of the Customs Court which justifies its conclusion that "substantial" use will suffice and we are of the opinion that in so holding it erred. The rule of law to be applied in this case is that chief use must be established, consistently with the numerous precedents above mentioned.

### The Evidence on Use

We are concerned with the uses of "Lignosol BD" and "Lignosol TSD". We shall use only the initials. By way of background, the record shows that the predecessor of the exporter-manufacturer of BD and TSD, a research organization created by a group of pulp and paper companies, began to work on the development and marketing of these and related products in 1943 with the purpose of finding as many uses as possible for products made from spent sulphite liquor, a by-product of pulp manufacture. Lignosol Chemicals Limited was incorporated in 1950. In 1956 it produced the 5th edition of a piece of descriptive literature entitled "The Lignosol Products," which gives the uses for the specific lignosulphonate products the company makes. As to BD, the publication makes the following summary statement:

LIGNOSOL BD, B—Calcium Lignosulphonate

Many common names are given to this product and its solution. Spent sulphite liquor, sulphite pitch, lignin pitch, sulphite cellulose lye are some of them. Products of this type have been in general use for a number of years and are prepared in much the same way by concentrating pulping liquors, and by drying the concentrated liquor. There is no other change.

Lignosol BD and Lignosol B are used in the construction of highways, railway embankments, airports and other earth structures to increase the bearing strength of their foundations and to reduce susceptibility to frost heaving. Excellent and persistent results have been obtained through treatment of frost heaves in railway embankments with Lignosol B. Lignosol B is also used for dust-laying and to stabilize the profile of a highway prior to paving. Both grades are used as foundry core binders, to improve the dry strength of ceramic ware, in linoleum cements, in the manufacture of gypsum wallboard, and as binders in the preparation of briquettes and pellets and in the manufacture of refractory brick.

Lignosol B is a 50% solution of Lignosol BD. That is the end of the general statement and it is noted that use in tanning is not there so much as mentioned. There is a table of uses of the various products and *in addition* to the uses above mentioned we there find for BD the following uses: resin extender, sludge dispersant in boiler feed water, iron sequesterant, foam stabilizer, asphalt emulsion stabilizer, mold

wash in foundry, desliming, depressant in floatation, plasticizer for refractory cement, and elsewhere it is shown to be useful as an insecticide and fungicide dispersing agent.

Two of appellee's witnesses testified to facts which show that BD and TSD are useful in tanning, are sold to tanneries, and we do not doubt that they are "used for tanning." However, as we have held, what must be shown here is that they belong to a class of materials the chief use of which is in tanning. As to BD the record is simply devoid of evidence as to what its chief use, quantitatively, is if, indeed, there is any "chief" use for the material. We are therefore obliged to hold that appellee has not sustained its burden of proof as to BD.

The situation is somewhat different as to TSD, the ammonium lignosulphonate. The manufacturer's technical director, Dr. Keirstad, testified as to it:

The ammonia base was produced and designed especially for its use in tanning. The letter T in the code stands for tanning. The characteristics are adjusted to make them suitable for tanning leather. That's the purpose of the process, and the object of the material.

The above-mentioned Lignosol publication contains the following general description:

LIGNOSOL TSD, TS—Ammonium Lignosulphonate

This product was developed specifically for the tanning industry and it is now used in a variety of processes. Complete removal of calcium and an extremely low iron content, less than 0.05%, are unique features. Many of the difficulties experienced in earlier attempts to use this type of product may be traced to incomplete removal of calcium. The calcium ion precipitates vegetable tannins and splits fat liquor emulsions. [These emulsions are used in tanning.]

In vegetable tanning processes Lignosol TSD and Lignosol TS provide a source of low cost tanning material, reduce astringency of vegetable blends, disperse sludge and speed penetration of vegetable extracts, particularly when used as a pretan. It is also used in dry dipping formultations and as an ingredient of bleaches or fillers. It has a low ash content, less than 1% dry basis.

In chrome tanning, Lignosol TSD is used as a retan, where it provides a fine break, tight bellies and flanks, and a light colour suitable for finishing in pastel shades. Leather retanned with Lignosol TSD buffs to a smooth short nap, a point of interest to suede leather manufacturers. Lignosol TSD may be used before, during or after chrome tanning, before, during or after fatliquoring or dyeing.

Lignosol TS is a 50% solution of Lignosol TSD.

The above-quoted publication was put in evidence by the Government. Appellee contends that Lignosol TSD has no other use than in tanning and that no other use has been shown by the Government. The Government contends chief use of TSD in tanning has not been established

by appellee. As with BD, there is no quantitative evidence. The above quotation says TSD, though developed for tanning use, "is now used in a variety of processes." Going a little further into the manufacturer's publication and its table and descriptions of uses, we find specific listing of TSD for use in agricultural products and agriculture as dispersing agent, fertilizer conditioner, and soil conditioner; in gypsum board manufacture as a water reduction agent; in foundry core paste; in industrial pelleting and briquetting wherever there is an objection to calcium. We are of the view that the Government has shown uses for TSD other than in tanning and that appellee's points are not well taken. With this showing in the record and in the total absence of evidence of the relative quantities consumed in the various recommended uses we are unable to find tanning to be the chief use. We do not feel we can presume tanning to be the chief use merely from the purpose for which TSD was *originally* developed.

As to both items of importation on appeal we hold, therefore, that appellee failed to meet the burden on it to show that its claimed classification is the correct one.

We have further considered the items of legislative history and alleged administrative practice urged upon us as showing a clear intent of Congress to classify these imports as materials used for tanning but find them unpersuasive. At best they show that at some past times lignosulphonates have been so classified, as they were in the *Meyers* case, according to the supposed uses of the materials at the time of entry. But, as made clear in the *Baltimore & Ohio* case, it appears to us that it is the intent of Congress, when it enacts use provisions, that classification for duty shall change with changing uses. It may not be a practical system to administer, but if it is not, it is for Congress, not for us, to mend it.

Finally, there is a contention by appellee that if the imports cannot be directly classified in paragraphs 38 and 1670(b) that they should be so classified by similitude under paragraph 1559(a). The Customs Court properly disposed of this contention, saying:

Where a tariff provision contains a specific limitation as to some property of the merchandise, it is not proper to classify thereunder by similitude merchandise which does not have that property. The use provision in paragraphs 38 and 1670, as amended, is not merely descriptive; it is also exclusionary. *Maher-App & Company* v. *United States*, 44 CCPA 22, C.A.D. 630.

The judgment of the Customs Court, insofar as it sustained the protest with respect to lignin extracts BD and TSD, is *reversed*.